**Gerald P. OLEJNICZAK and Sandra Olejniczak, Plaintiffs,**

v.

**E.I. DU PONT DE NEMOURS AND COMPANY, Defendant.**

No. 96–CV–81A.

United States District Court,
W.D. New York.

Aug. 16, 1999.

Alan Feuerstein, Buffalo, NY, for plaintiffs.

Paul B. Zuydhoek, Phillips, Lytle, Hitchcock, Buffalo, NY, for defendant.

## DECISION AND ORDER

ARCARA, District Judge.

### *INTRODUCTION*

Plaintiffs Gerald P. Olejniczak ("Olejniczak") and his wife, Sandra Olejniczak, New York state residents, commenced this action in New York state court in December of 1995, to recover for injuries incurred by Olejniczak when he allegedly slipped and fell at a plant operated by defendant E.I. du Pont de Nemours and Company ("DuPont"), a Delaware corporation. DuPont removed the action to this court on February 7, 1996, on the basis of diversity jurisdiction. Following completion of pretrial discovery, a non-jury trial was held in December of 1998 and January of 1999.

The Court heard the testimony of approximately sixteen witnesses over fifteen days of trial. The parties submitted proposed findings of fact and conclusions of law, and the Court heard summations on March 25, 1999. For the reasons discussed below, the Court finds that judgment shall be entered in favor of defendant DuPont. The following constitutes the Court's findings of fact and conclusions of law pursuant to Federal Rule of Civil Procedure 52(a).

### *FINDINGS OF FACT*

#### I. Events of January 19, 1994

At the time of the events in question, Olejniczak was a truck driver employed by Praxair, Inc., a chemical company. Trial Transcript ("Tr.") 90. Praxair supplies DuPont with liquid nitrogen, which DuPont uses at its plant in Tonawanda, New York. This relationship between Praxair and DuPont is governed to some extent by

an agreement signed by DuPont and Praxair's corporate predecessor, Union Carbide Corporation's Linde Division, on May 24, 1979.[1] *See* Plaintiff's Exhibit ("P.Ex.") 1. On January 19, 1994, Olejniczak set out from Praxair to make a delivery of nitrogen to DuPont's Tonawanda plant. Tr. 261

Olejniczak testified that he fell while at DuPont's plant that day. There were no other witnesses to the fall. Thus, the following paragraphs set forth Olejniczak's account of the circumstances of the fall.[2]

According to Olejniczak, he arrived at the DuPont plant at approximately 11:00 a.m.[3] He pulled his tanker truck up onto the concrete pad upon which DuPont's nitrogen tank is located. Tr. 270, 682. As it was an extremely cold winter day, he put on a parka and a pair of overboots before leaving the cab of his truck. Tr. 594–95. He informed an unidentified DuPont employee in the control room near the nitrogen tank that he was there to deliver nitrogen and then hooked up the lines from his truck to the nitrogen tank. Tr. 683. An unidentified DuPont lab technician came out to the truck, did routine testing on the contents of the tanker truck, and left.

Olejniczak testified that he then tried to unload the nitrogen but was unable to operate the pumping system, presumably because of the extremely cold temperatures. Tr. 685. He entered the control room, called Praxair, and discussed with an unidentified Praxair employee the problem he was having unloading the nitrogen. Tr. 686. Olejniczak then went back out to the truck, again tried to unload the nitrogen, and again was unsuccessful. Tr. 686–87. He then returned to the control room and called Praxair a second time. Tr. 687. The unidentified Praxair employee instructed Olejniczak to ask a DuPont employee if he could use a steam hose to heat up the lines on the truck. Tr. 687.

. Pursuant to these instructions, Olejniczak asked the control room operator if he could use the steam hose DuPont kept near the nitrogen tank. Tr. 688. The control room operator, whose name Olejniczak cannot recall, agreed to allow Olejniczak to use the steam hose, went outside with him, and hooked up the hose for him. Tr. 688. Olejniczak wedged the steam hose into the back of the tanker, where the valves were located, and for some time directed the steam at the back of the tanker. Tr. 688–89. When this method proved unsuccessful, Olejniczak took the hose and walked up and down the side of the tanker while spraying it with steam to try to heat up the lines to allow the nitrogen to flow through them. Tr. 690.

It was at this time that Olejniczak claims that he fell. At trial, Olejniczak described the accident as follows:

> At one point it felt like the hose had gotten hooked on something. I turned to see what it was, and I noticed that an area back towards the end of the hose had melted into the ice and the hard

1. The agreement provides, *inter alia*, that "[p]urchaser [DuPont], at its expense will: provide a suitable site or sites for the storage unit or units with access either by road or railroad siding as mutually agreed; construct a suitable foundation for each storage unit ... and furnish utilities if required by Seller [Linde / Praxair] in connection with each storage unit, such as electric power, water and/or steam, and the facilities to deliver such utilities to the point or points on each storage unit site designated by Seller." P.Ex. 1 at ¶ 5(a).

2. As Olejniczak's testimony about the day's events was extremely detailed, the Court herein sets forth a summary of only the relevant testimony.

3. This is corroborated to some extent by Olejniczak's log book entry for that day, which reflects that he reached an unspecified delivery site in Tonawanda at 11:00 a.m. on January 19, 1994. *See* P.Ex. 2, "Driver's Daily Log"; Tr. 247–48. Other documents that could corroborate Olejniczak's presence at DuPont's plant on that day, if they once existed, were unavailable by the time discovery commenced, as the retention periods for those documents had elapsed. Tr. 125–26, 155, 195, 197.

packed snow. I turned around and I gave it a little pull or tug, and that's when my feet came from underneath me, because I was standing on ice and hard packed snow. And I went right down into a sitting position.

Tr. 599–600. Olejniczak testified that when he fell he felt a "sharp jolt" and a "slight twinge in his back." Tr. 600. After pulling himself up, he went back into the control room. Tr. 605. Olejniczak called Praxair again, told the unidentified person he was speaking to that he had fallen, and was instructed to bring the truck back to Praxair. Tr. 608. According to plaintiff, he also informed an unidentified person at DuPont that he had fallen, and that person "turned around and just walked away from me." Tr. 609. Olejniczak then returned to his truck and drove back to the Praxair facility.

Olejniczak testified that when he left DuPont it was approximately 2:15 p.m. Tr. 275. Thus, he was at the DuPont plant for about three hours and fifteen minutes that day. Tr. 275.

## II. Olejniczak's Credibility

As the trier of fact, the Court must assess the credibility of the witnesses at trial. Here, Olejniczak's credibility is of pivotal importance; as his accident was unwitnessed, and there are no contemporaneously created reports documenting the accident, he is the sole source of information about the accident. After observing Olejniczak testify over the course of several days, the Court finds that Olejniczak is not a wholly credible witness.

The Court bases this finding on several facts. First, during the course of the trial, Olejniczak admitted that he had lied under oath during his deposition. For example, when asked at deposition whether he had ever been arrested, he responded that he had not. Tr. 666. At trial, however, he testified that he had been arrested once and admitted that his deposition testimony was not true. Tr. 665–66. Similarly, Olejniczak admitted that he lied at his deposition when he denied ever being on probation or ever appearing before family court. Tr. 667–68. The Court, of course, is hesitant to credit a witness who admits to having lied under oath. Moreover, to explain why he had lied at his deposition, Olejniczak stated that "[i]t was none of her [defendant's counsel's] business, because it did not have anything to do with my accident." Tr. 666. This explanation causes the Court to be wary to credit Olejniczak's testimony, as it evidences a belief by Olejniczak that he was free to pick and choose when he would tell the truth under oath and when he would not.

Olejniczak also appeared to be less than forthcoming regarding prior accidents and injuries. On Friday, December 4, 1998, Olejniczak was questioned on direct examination about his various prior injuries. After Olejniczak had described several injuries, plaintiffs' counsel asked him whether he had sustained any other injuries prior to the date of the accident, to which he responded that he had not. Tr. 227–28. Counsel for plaintiffs then asked Olejniczak whether he had ever sustained any injuries to his lower back. Olejniczak again replied that he had not. Tr. 228. At that point, counsel for defendant asked the court reporter to mark that part of the record. The following Monday, December 7, 1998, when Olejniczak resumed his testimony, he testified that "over the weekend I had remembered a few facts that I forgot to tell you on questioning me about injuries." Tr. 291. Olejniczak then went on to reveal several more injuries he had sustained, including one injury to his back. Tr. 295. Olejniczak testified that he had spoken to his mother over the course of the intervening weekend, and that she had reminded him of those injuries. Tr. 291. It appeared to the Court, however, that after Olejniczak heard defendant's counsel's request to mark the record, Olejniczak reconsidered his initial hesitance to truthfully reveal all his prior injuries.

Further, Olejniczak's testimony was not altogether credible with respect to events on the day of the accident. When asked at

his deposition what caused his feet to come out from under him, Olejniczak responded, "I don't know. They just did." Tr. 715. Later, at trial, Olejniczak answered the same question differently, stating, "I was standing on hard pack ice, snow and ice. It was slippery and that's what really caused me to fall." Tr. 714. The Court finds this change of testimony highly suspect.[4] Moreover, throughout the course of his trial testimony, Olejniczak repeatedly described the ground conditions with the phrase "hard packed snow and ice." *See,* *e.g.,* Tr. 504, 505, 596. His rote repetition of this phrase reduced his credibility on the important subject of the weather and ground conditions on the day of the accident.

Moreover, the Court notes that both of the DuPont employees who worked on January 19, 1994 as control room operators testified at trial. *See* Tr.2086 *et seq.* (testimony of Michael Gross); Tr. 2351 *et seq.* (testimony of Ken Stahl). Neither one recalled the specific events of January 19, 1994 or a truck having delivery problems that day. Tr. 2208, 2217, 2403. The fact that neither of these witnesses recalled the events described by Olejniczak—a truck driver who fell after spending over three hours attempting to unload his tanker on the coldest day of the year—causes the Court to be suspect of Olejniczak's testimony.

### III. Weather and Ground Conditions at DuPont Plant on January 19, 1994

Important issues in the determination of this case are the weather conditions and the condition of the ground where Olejniczak fell on January 19, 1994.

### A. Weather Conditions

Evidence was presented at trial regarding the weather conditions before and during the time of Olejniczak's alleged fall. According to Olejniczak, on that day, "[i]t was extremely cold. It was below zero," Tr. 253, and "[t]he roads had a light covering of snow on it because it snowed during the night. And it was extremely cold and there was wind blowing." Tr. 254.

Another witness who testified about the weather conditions on January 19, 1994 was Jonathan Owczarek. Owczarek worked as a security guard for a company with which DuPont contracted to provide security at the Tonawanda plant. Tr. 1852, 1854. Owczarek's responsibility at the plant was to man the guard house located at the plant's main entrance. Tr. 1857. Referring to the report he filled out on January 19, 1994, Owczarek testified that on that day he had to scrape ice and frost off the windows on the doors to the guard house. He stated that, "it was so icy, the whole door was just pure ice. You could not see through it. And we had to scrape it, it was so icy." Tr. 1897. Owczarek further testified that it was extremely cold, and that it was the only day he had ever had to scrape ice off the windows. Tr. 1898.[5]

Additional evidence regarding weather conditions was presented in the form of an

---

4. In making this credibility determination, the Court has also taken into account the fact that in defendant's motion for summary judgment in this case, filed September 8, 1997, defendant heavily emphasized the fact that plaintiff had testified at his deposition that he did not know what had caused his feet to come out from under him. Plaintiff's change in his testimony, following defendant's argument on summary judgment, makes his testimony at trial subject to doubt.

5. Much of Owczarek's direct testimony concerned the fact that he often had to clear the pedestrian entrance of snow and ice because of the service department's failure to do so. He testified that the service department employees did not want to get out of their trucks to shovel the snow in that location. The Court gives this testimony little weight because the area where plaintiff fell is geographically removed from the area near the guard house, the area described by Owczarek. Moreover, the area where plaintiff fell was an area that was plowed, not shoveled by hand, making Owczarek's testimony in this regard even less probative.

exhibit, a monthly summary of climatological data prepared by the United States Department of Commerce, dated April 22, 1994. *See* D.Ex. 8. That exhibit shows the weather conditions recorded at the Buffalo Airport on, *inter alia,* January 19, 1994.[6] *Id.* The temperature that day ranged from one degree below zero to ten degrees below zero on the Fahrenheit scale. Tr. 2138–39. The exhibit also showed that at 10:00 a.m. on January 19, 1994, there was blowing snow, the temperature was nine degrees below zero, and the wind speed was 18 knots. Tr. 2149. At 1:00 p.m. that day, there were snow showers and blowing snow, the temperature was four degrees below zero, and the wind speed was 18 knots. Tr. 2152.

### B. Ground Conditions

At trial, Olejniczak repeatedly testified that the ground where he fell consisted of "hard packed snow and ice." Tr. 504, 505, 596. He further testified that there was "no salt, no sand, no nothing" spread on the ground. Tr. 505. However, he did testify that the ground "looked like it had been freshly plowed." Tr. 515.

Alfred Zuzze, a DuPont employee, testified about snow removal procedures at DuPont. Zuzze was employed in DuPont's service department, which is responsible for snow removal, from September 1994 until 1995.[7] Tr. 1580, 1582, 1587. Zuzze testified that he has been plowing snow for approximately twenty-five years, and that he owns a business that performs snow removal services for other businesses. Tr. 1681–82, 1706. Zuzze testified that in 1994, DuPont owned several pieces of snow removal equipment, including four wheel drive pick-ups equipped with plow blades,

and a tractor with a front-mounted plow and a rear-mounted salter. Tr. 1584–85.

Zuzze further testified about the standard snow removal procedures in place in 1994. Apparently there was no written manual regarding snow removal procedures at the plant. Tr. 1595, 1614. He testified that members of the Service Department would arrive two hours early in the winter months. They would clear the walkways and roadways of the forty acre plant site first. Tr. 1592. Zuzze testified that as part of the standard operating procedure, during this "opening pass" of the plant,

> The tractor operator would be driving from east to west, plowing as he drove, in front of the nitrogen tank. He would push snow past the nitrogen tank, stop, back up, pull up to the skirt on the nitrogen tank, it's like a ramp, lower the blade, and back drag that ramp.

Tr. 1611. Zuzze explained that plow blades, such as those used at DuPont, are raised on "skids," which keep the edge of the plow blade a short distance off the ground. Tr. 1706–08.

After removing the snow, the operator would "come back in and turn on the salter and salt the area that he just plowed." Tr. 1612–13. Zuzze also testified that at temperatures below zero degrees, salt will not effectively melt ice. Tr. 1691. Zuzze testified that DuPont does not, and to the best of his knowledge never has, spread sand over snow and ice. Tr. 1682. He also testified that he is unaware of any businesses in the Western New York area that do use sand. Tr. 1706.

As already discussed above, the Court has found that Olejniczak is not an entirely credible witness, especially regarding his testimony about the ground conditions and

---

6. The Court takes judicial notice of the fact that the Buffalo Airport is approximately ten miles from the DuPont plant; thus, the Court will infer that the general weather conditions at the Buffalo Airport were substantially similar to those at the DuPont plant.

7. Despite the fact that Zuzze was not yet employed by the service department on date of the accident, both plaintiffs's counsel and defendant's counsel asked Zuzze about snow removal procedures in effect at that time. Zuzze did, however, testify that he was familiar with the snow removal procedures in place in January 1994. Tr. 1698–99.

the cause of his fall. In light of the credibility problems with Olejniczak's testimony, the Court finds that it is more likely that the ground conditions on January 19, 1994 were in accord with the standard procedures described by Zuzze. Pursuant to those procedures, it is highly likely that the area around the nitrogen tank, where Olejniczak fell, was plowed and salted.[8] The Court does not credit Olejniczak's testimony to the contrary.

## IV. Olejniczak's Injury

Olejniczak testified that upon returning to Praxair, he was experiencing "a lot of pain" in his back, so he telephoned his wife to come and pick him up at Praxair. Tr. 289. Olejniczak's wife did so and took him to the Mercy Ambulatory Care Center, where he was seen by a doctor. Tr. 290. The following day, Olejniczak was still experiencing pain, so he saw his own physician, who prescribed pain medication and rest. Tr. 298. Olejniczak was unable to return to work and over the course of the next year continued to have problems with severe back pain. He saw several different physicians, had many tests done, and was prescribed various pain medications and therapies. Tr. 310–17. These attempts proved unsuccessful at treating Olejniczak's pain, and so in April of 1995 he underwent surgery at Buffalo General Hospital. Tr. 319.

Dr. James Egnatchik, Olejniczak's surgeon, testified at trial that he performed "a left L–5—S1 diskectomy and fusion with iliac crest bone." Tr. 1071. Olejniczak initially obtained some relief from the first surgery, but by November of 1995 his pain returned. Tr. 322–32. Olejniczak's problems with back pain worsened until the end of July or beginning of August of 1996, when Dr. Egnatchik performed a second surgery on him at Buffalo General Hospital. Tr. 339–43. That surgery succeeded in reducing Olejniczak's pain, although he still today experiences some pain and is limited in his physical activities. Tr. 355–58.

Olejniczak has never been able to return to work and accordingly receives Workers' Compensation payments, Social Security Disability Benefits, a Teamsters' disability pension, and Veterans' Administration benefits. Some of these payments appear to be received by Olejniczak for his various other health problems, including diabetes and post traumatic stress disorder, as well as for his back injury. In all, Olejniczak currently receives approximately $4,600 per month—$55,200 per year—from these sources. Tr. 359, 361–62.

Dr. George Kartalian, an expert witness who testified for the plaintiffs, testified about his examination of Olejniczak in September of 1996. Dr. Kartalian stated that in his opinion, Olejniczak had, a "moderate to marked permanent disability" as a result of the January 19, 1994 injury. Tr. 416, 419.

Olejniczak also testified that since the accident, he has been unable to have a satisfying intimate relationship with his wife. Tr. 367–68. Mrs. Olejniczak testified to this effect as well. Tr. 993–94. Additionally, Mrs. Olejniczak testified that Olejniczak is now unable to perform routine household chores that he used to perform before the accident. Tr. 992.

### CONCLUSIONS OF LAW

#### I. Elements of Plaintiff's Negligence Claim

The parties do not dispute that New York substantive law is controlling in this diversity action. Under New York law, a plaintiff must prove the following elements to establish a cause of action based on negligence: (1) the existence of a legal duty; (2) a breach of that duty; (3) that the breach was the proximate cause of

---

**8.** Although Zuzze testified that salt would not melt ice at very cold temperatures, the Court understood Zuzze's testimony as stating that even in those very cold temperatures, salt was spread as a matter of course.

the injury; and (4) damages. *See Ellis v. Mildred Elley School Inc.,* 245 A.D.2d 994, 667 N.Y.S.2d 86, 87 (1997); *see also Japan Airlines Co., Ltd. v. Port Authority of New York and New Jersey,* 178 F.3d 103 (2d Cir.1999) (listing the four elements as: "(1) that there was a duty owed to the plaintiff, (2) lack of due care by the defendant, (3) injury, and (4) the injury was proximately caused by the defendant's breach of duty."). Moreover, "[i]t is well settled that a property owner may not be held liable for snowy or icy conditions unless it has actual notice thereof or it has had a reasonably sufficient time from the cessation of the precipitation to remedy the conditions caused thereby." *Baum v. Knoll Farm,* 259 A.D.2d 456, 686 N.Y.S.2d 83 (1999).

### A. Breach of Duty

The parties have set forth several different standards that they argue should be applied in this case to determine whether DuPont breached the duty of care it owed to a person in Olejniczak's position. DuPont argues that the "storm in progress" doctrine applies to determine the duty of care and whether a breach occurred, or, in the alternative, that the standard applied should be the duty generally applicable in a negligence action. Olejniczak argues that a heightened duty of care standard must be applied. Each of these three standards is discussed below. Under any of these standards, Olejniczak has failed to proved by a preponderance of the evidence that DuPont breached the duty it owed to him.

### 1. Storm in Progress Doctrine

█ Under New York law, when ruling on a tort action involving a plaintiff's fall on snow or ice, a special rule comes into play. Under the "storm in progress" doctrine, "a landowner has a reasonable time in which to address a storm-related snow or ice condition on its property subsequent to the cessation of the storm and is not required to take any corrective actions while a storm is still in progress." *Reynolds v. Sead Development Group,* 257 A.D.2d 940, 684 N.Y.S.2d 361 (1999). Thus, in cases where plaintiffs have sued for injuries sustained from falling on snow or ice, New York courts have granted judgment in favor of the defendants if the evidence shows that a storm was in progress at the time of the plaintiffs' fall. *See, e.g., id.* at 362; *Micheler v. Gush,* 256 A.D.2d 1051, 684 N.Y.S.2d 297, 298 (1998); *Swartz v. Liberatore,* 254 A.D.2d 692, 678 N.Y.S.2d 552 (1998); *Zonitch v. Plaza at Latham L.L.C.,* 255 A.D.2d 808, 680 N.Y.S.2d 304, 305 (1998); *Jensen v. Roohan,* 233 A.D.2d 587, 649 N.Y.S.2d 100, 100 (1996); *Zima v. North Colonie Central Sch. Dist.,* 225 A.D.2d 993, 639 N.Y.S.2d 558, 558 (1996).

█ The storm in progress doctrine is not limited to situations where blizzard conditions exist; it also applies in situations where there is some type of less severe, yet still inclement, winter weather. *See Micheler,* 684 N.Y.S.2d at 298 (finding storm in progress doctrine barred liability for defendant where "ice on which plaintiff slipped was produced by winter weather conditions—namely, a drizzling rain coupled with falling temperatures"); *Zonitch,* 680 N.Y.S.2d at 305 (holding that "like icy sidewalks and snow-covered parking lots, a wet, slippery entranceway, caused by tracked-in snow and slush, is a reality of winter weather which a landowner ordinarily is not required to rectify until the underlying weather condition has abated"); *Zima,* 225 A.D.2d 993, 639 N.Y.S.2d 558, 558 (finding that "although it is clear that no major winter storm occurred at the time of the accident, the undisputed proof sufficiently establishes the existence of an ongoing hazardous weather condition that defendant was under no obligation to correct until a reasonable time after it had ended"); *Boyko v. Limowski,* 223 A.D.2d 962, 636 N.Y.S.2d 901, 902 (1996) (stating that the storm in progress doctrine "affords landowners a reasonable time after the cessation of a storm *or temperature*

*fluctuations which created the hazardous condition* to take corrective action") (emphasis added).

■ Applying the storm in progress doctrine to the facts of this case, the Court finds that defendant was under no duty to correct any icy conditions that may have existed at the DuPont plant at the time plaintiff fell. The evidence presented at trial established that the inclement weather conditions which existed prior to and at the time of Olejniczak's fall were unusually severe for the Western New York area. The extreme cold, the high winds, and the blowing snow combined to create an ongoing hazardous situation at the time of the fall which DuPont was under no duty to correct until a reasonable time after those conditions ceased.[9]

**2. General Duty of Reasonable Care**

■■ Even if the storm in progress doctrine did not apply, DuPont could not be found to have breached the duty it owed to Olejniczak. Under New York law, a "landowner must act as a reasonable [person] in maintaining his property in a reasonably safe condition in view of all the circumstances, including the likelihood of injury to others, the seriousness of the injury, and the burden of avoiding the risk." *Basso v. Miller*, 40 N.Y.2d 233, 241, 386 N.Y.S.2d 564, 352 N.E.2d 868 (1976). The Court finds that there is no evidence that DuPont did not act reasonably under all the circumstances present on January 19, 1994. There is no credible evidence that DuPont did not follow its standard procedure for snow removal—plowing and salting the area where Olejniczak fell—on that day. Although these procedures may not have cleared the area down to the bare pavement, it is simply a reality of winter-

time in Western New York that at times it is nearly impossible to completely clear pavement, especially under circumstances like those on the day of the accident, with extremely cold temperatures and blowing snow. Thus, even if the storm in progress rule did not apply, DuPont would not be liable for Olejniczak's injuries, as it did not breach the duty of care owed to him.

**3. Heightened Duty of Care**

Olejniczak has argued that the supply contract between DuPont and Praxair's corporate predecessor[10] augments the common law duty owed by DuPont to Praxair's employees. Olejniczak further argues that DuPont breached this heightened duty of care and thus is liable for his injuries. *See* Plaintiff's Proposed Findings of Fact and Conclusions of Law, Item No. 68, at 12.

The Court is unpersuaded by this argument. As an initial matter, it is dubious whether this particular contract, which contains no language about snow removal or about maintenance of the area around the tank, would create a higher duty in this instance, as Olejniczak suggests. Even if such a higher duty were created, however, the Court finds that DuPont did not breach this duty. As the Court has found, it is more likely than not that DuPont plowed the area around the tank and then salted it. Under even a heightened standard of care, in light of the weather conditions that day, DuPont cannot be found to have been negligent in taking these steps to deal with the hazardous situation created by the weather.

**B. Causation**

■ Even if DuPont were found to have breached its duty of care, Olejniczak's

---

9. The Court notes that as the storm in progress doctrine applied in this case, even if the Court found Olejniczak an entirely credible witness, under this theory, his claim would still fail. The Court also notes that DuPont argued at the summary judgment stage that this case should be dismissed on the basis of the storm in progress doctrine, and its motion

was denied. At trial, however, more evidence was adduced regarding the weather conditions on January 19, 1994, which has permitted the Court to grant judgment in DuPont's favor on this ground.

10. *See* Footnote 1, *supra*.

action would fail because Olejniczak failed to prove that DuPont's negligence was the proximate cause of his fall. A negligent act is considered the proximate cause of an injury if that act was a substantial factor in bringing about the injury. *See Nallan v. Helmsley–Spear, Inc.*, 50 N.Y.2d 507, 429 N.Y.S.2d 606, 614, 407 N.E.2d 451 (1980) ("it was plaintiffs' burden to show that defendants' conduct was a substantial causative factor in the sequence of events that led to [plaintiff's] injury"). The Court has found above that Olejniczak's testimony regarding the cause of his fall is plagued with credibility problems, especially since Olejniczak's testimony at trial regarding the cause of his fall was different from his testimony on this issue at his deposition. Since there is a lack of credible testimony regarding the cause of Olejniczak's fall, the Court finds that he has failed to prove this essential element of his negligence claim.[11]

### C. Notice

■ Olejniczak's claim must also be dismissed as there was insufficient evidence presented that DuPont had either actual or constructive notice that a dangerous condition existed. It is established under New York law that liability for a dangerous condition exists only where the defendant has notice, either actual or constructive, of the dangerous condition. *See Schleifman v. Prime Hospitality Corp.*,

246 A.D.2d 789, 668 N.Y.S.2d 258, 260 (1998). Here, there was no evidence presented that DuPont had actual notice; thus, Olejniczak's claim can only succeed if there is sufficient evidence of constructive notice.

■ To prove constructive notice, "plaintiff must demonstrate that the icy condition was visible and apparent, and had existed for a sufficient period of time to allow defendant's personnel to discover and remedy it." *Id.* Olejniczak presented no evidence that the slippery conditions which he claims caused his fall had existed for a sufficient amount of time prior to the fall to allow DuPont's employees to discover it. Thus, Olejniczak's claim must also be dismissed for failure to prove notice.

### D. Damages

As the Court has concluded that Olejniczak's claim fails on all the grounds discussed above, the Court will not reach the issue of damages.

### II. Mrs. Olejniczak's Loss of Consortium Claim

■ As plaintiff's claim is to be dismissed, Mrs. Olejniczak's derivative claim must also be dismissed. *See Holmes v. City of New Rochelle*, 190 A.D.2d 713, 593 N.Y.S.2d 320, 321 (1993) ("Since the cause of action to recover damages for loss of

---

11. Even if Olejniczak had successfully proved that DuPont was negligent, and that this negligence was the cause of his accident, DuPont's liability would have been significantly abated by Olejniczak's own negligence. Olejniczak testified that he noticed that the ground was slippery when he first arrived, but that he did not tell the control room operator that it was slippery. As discussed above, according to Olejniczak, he was at the DuPont plant for approximately three hours and fifteen minutes. Since he left shortly after he fell, Olejniczak must have been walking around the area where he fell for about three hours prior to actually falling, knowing that the ground was slippery. While a plaintiff's awareness of a dangerous condition does not preclude a finding of liability on the part of the landowner, it is relevant to the issue of

comparative negligence. *See Stern v. Ofori–Okai*, 246 A.D.2d 807, 668 N.Y.S.2d 68, 69 (1998).

Moreover, Olejniczak testified that he fell in the same area where he had been spraying the steam hose. Taking Olejniczak's testimony on this point as true, the Court finds that it is likely that Olejniczak contributed to the creation of slippery conditions through his own use of the steam hose.

Thus, even if Olejniczak had successfully proven that DuPont was negligent, and that its negligence caused his fall, DuPont's liability would have been curtailed by Olejniczak's own negligence contributing to the fall. As the Court finds, however, that DuPont is not liable, it will not further address Olejniczak's own negligence.

consortium is derivative in nature, the dismissal of the primary causes of action necessitates the dismissal of that cause of action as well").

## *CONCLUSION*

For the reasons discussed above, the Court finds in favor of defendant DuPont. The Clerk of Court is hereby ordered to enter judgment in favor of defendant and to take all steps necessary to close this case.

IT IS SO ORDERED.