HECHT, Justice
(concurring in part and dissenting in part).
I join Part II of the majority opinion clarifying that the scope of review regarding refusal to give a requested jury instruction is for correction of errors at law. Beyond that threshold question, however, the majority and I part ways significantly. I dissent because I find no reversible error in either of the jury instructions Marriott challenges on appeal. I also conclude the district court correctly declined on this record to submit the instruction proposed by Marriott on the continuing-storm doctrine. I would vacate the decision of the court of appeals and affirm the -judgment the district court entered on the jury’s verdict.
I. Negligent Training.
The law governing this issue is well established. “In considering whether [an] instruction- is supported by substantial evidence, we give the evidence the most favorable construction it will bear in favor of supporting the instruction.” Asher v. OB-Gyn Specialists, P.C., 846 N.W.2d 492, 496-97 (Iowa 2014). The majority orders a new trial in part because it concludes no testimony established the parameters of Marriott’s duty to exercise reasonable care in training its employees on proper approaches in removing ice from sidewalks. But Marriott concedes it owed a duty.[4] Its *713 objection to the training specification of negligence was instead that Alcala failed to present substántial evidence of a breach of that duty.
Alcala did not present expert testimony on the Standard of care hotels must meet in training their employees on proper snow and ice removal techniques or1 on Marriott’s breach of that duty. In my view, however, expert testimony was not required on these subjects. “The question of what a reasonable person would do ... in training' and supervising employees is. one permissibly resolved on the basis of the knowledge and experience of lay persons.” Graves v. N.E. Servs., Inc., 345 P.3d 619, 628 (Utah 2015).[5]
Some weather-related ■■ phenomena are clearly within a layperson’s understanding:
We know that it is dangerous to be in or near certain structures, or even trees, during lightning storms. We also know that, if we are in an area of high lightning frequency, we should be cautious, and that the height of-the structures in relation to the surrounding terrain might attract lightning. In other words, ... risk assessment factors [regarding lightning damage protection] [a]re not complicated or novel ideas or even foreign to a ’ layperson’s understanding about the phenomenon of lightning.
Mensink v. Am. Grain, 564 N.W.2d 376, 381 (Iowa 1997). Similarly, a plaintiff need not present an engineer to opine that stacking logs haphazardly might result -in the pile toppling over and injuring a bystander:
Where the construction of a given pile of timber is properly explained, it appears to us that a jury of [people] not especially experienced in piling timber would have no difficulty in forming an opinion for themselves as to the liability of the *714 pile to fall and injure a person who should be near it. Such work, it seems to us, does not in any proper sense involve the mystery of technical knowledge or skill.
Baldwin v. St. Louis, Keokuk & N. Ry., 68 Iowa 37, 39, 26 N.W. 918, 919 (1885). Likewise, I would hold deicer’s durational effectiveness and Marriott’s duty to address the subject when training its employees on proper techniques for removing ice from sidewalks does not require expert testimony. Information on the durational effectiveness of the deicer Marriott used is discernable from the product manufacturer without special knowledge, education, or expertise. Indeed, Bowman — an expert in architecture but a layperson with respect to commercial snow and ice removal— demonstrated his ability to discern the du-rational effectiveness simply by reading available product literature. See Spencer v. Wal-Mart Stores E., LP, 930 A.2d 881, 888-89 (Del.2007) (noting an architect was not “an expert on- ice and snow removal”).
I. now turn to the question of whether the record — when viewed in the light most favorable to the instruction, see Asher, 846 N.W.2d at 496-97-includes substantial evidence of a breach of Marriott’s duty to properly train its employees. Unlike the majority, I conclude the record does include evidence from which the jury could find Marriott breached its duty to exercise reasonable care in training.
The evidence on the condition of Marriott’s sidewalk and the presence of adequate quantities of deicer is conflicting and greatly in dispute. DePaepe testified there was already “salt all over the sidewalks” when she arrived for her overnight shift at 10:00 p.m. on January 20. Although a reasonable fact-finder could find on this record that there was no new measurable precipitation during her shift, DePaepe testified — and her nightly checklist represents — that she applied more deicer three times during her eight hours: from 12:03 to 12:20 a.m., 2:29 to 2:59 a.m,, and 5:24 to 5:40 a.m. If Bowman’s testimony that the deicer generally remains effective for three to four hours is correct, and DePaepe’s testimony is true, any failure to train DePaepe about durational effectiveness of the deicer arguably did not cause Alcala’s injury because DePaepe testified she reapplied the deicer within the product’s durational effectiveness. .
But the jury was entitled to make credibility determinations and sort out conflicts in the evidence. DePaepe testified there was plenty of deicer on the sidewalk both when she arrived at 10:00 p.m. on January 20 and when she left after 6:00 a.m. on January 21. Marriott’s operations manager testified she remembered the deicer granules crunching under her boots as she entered the building around 7:00 a.m. on January 21. However, other evidence tendéd to show that at the time Alcala fell, the sidewalk was treacherously slick. The paramedics who responded to the 911 call testified they “had a hard time getting to” Alcala and “were having a hard time staying” upright themselves. One even testified the sidewalk was “eight or higher” on a ten-point slipperiness scale and that the fire department dispensed its own chemical to provide the paramedics with better traction. Furthermore, another witness who was a guest at the Marriott testified that when he left the hotel just before Alcala, the sidewalk was so slippery'that he opted to walk on the adjacent grass instead to avoid falling.
A reasonable juror could infer from this conflicting evidence that' DePaepe did not apply the deicer with the frequency she claimed. A reasonable fact finder could also find from DePaepe’s testimony that she had not been trained on the deicer’s durational effectiveness. The jury could *715 find that had DePaepe been provided this information during training or instructed to seek out such information and follow it, she would have understood any deicer applied before 3:00 a.m. (and certainly before 10:00 p.m. the night before) would no longer be effective after four hours if temperatures remained around freezing. In other words, if DePaepe’s testimony about distribution of the deicer and the condition of the sidewalk at material times was rejected as not credible in whole or in part, the jury could have found on this record that her failure to apply the deicer properly was a result of Marriott’s inadequate training on the durational effectiveness of the deicer. Put yet another way, the jury could have found that DePaepe did not apply the deicer in a timely fashion because she was not properly trained on its durational effectiveness. This conclusion would require the jury to make several inferences, but fact finders properly utilize inferences in almost every case.
I also reject the majority’s conclusion that a jury question on negligent training must fail because Alcala did not offer.express testimony that Marriott breached its duty to exercise reasonable care in training its employees. All manner of negligence claims that do not require expert testimony to establish a standard of care are submitted to juries — and have been for decades — without express testimony from a witness that the defendant breached a duty owed to the plaintiff. For example, in automobile negligence cases, trial judges commonly submit a specification of negligence on the duty to keep a proper lookout without express testimony — lay or expert — that the defendant breached the duty. See, e.g., Graber v. City of Ankeny, 616 N.W.2d 633, 643-44 (Iowa 2000) (concluding the record contained sufficient evidence to support an instruction on proper lookout when both drivers testified about what they saw immediately before the collision); Luther v. Jones, 220 Iowa 95, 103, 261 N.W. 817, 821 (1935) (concluding the trial court correctly submitted proper lookout to the jury even though there was “no evidence, aside from the fact of the accident, that [the defendant] failed to keep a proper lookout”).
Similarly, in premises liability cases against grocers, specifications of negligence are commonly submitted to juries without express testimony that grocers breached the duty to keep walkways free of hazards. See, e.g., W. Supermarkets, Inc. v. Keith, 528 So.2d 317, 320-21 (Ala.1988) (concluding a negligence claim was properly submitted to the jury based on the plaintiffs testimony about what she observed and the store employees’ testimony that they swept and cleaned at regular intervals); Strack v. Great Atl. & Pac. Tea Co., 35 Wis.2d 51, 150 N.W.2d 361, 363 (1967) (concluding a jury’s finding that a store “failed to inspect and sweep within a reasonable time before the accident” had “adequate support in the evidence” even though there was “no direct testimony establishing the Italian prune [on which the plaintiff slipped] was on the floor” for a lengthy period). Just as the court in Strack did not require the plaintiff to produce express testimony that the defendant grocer breached its duty to keep its aisles safe for customers by leaving a prune on the floor too long, Alcala had no burden to produce testimony that Marriott breached its duty to properly train DePaepe when it failed to train her on the durational effectiveness of the deicing compound she was required to use on the company’s sidewalks. And just as we do not require a plaintiff to produce express testimony that the defendant failed to keep a proper lookout while driving her car at the time of a crash, Alcala had no burden to produce express testimony on Marriott’s breach of its duty to train DePaepe in this case.
*716 I acknowledge the jury could conclude on this record that DePaepe was credible and that she dutifully applied deicer three times during her shift at the times she recorded on her checklist. But in evaluating the sufficiency of the evidence supporting a jury instruction, “we give the evi-. dence the most favorable construction it will bear in favor of supporting the instruction.” Asher, 846 N.W.2d at 496-97. Perhaps Alcala could have presented more evidence supporting the improper training specification of negligence, but what she did present — testimony permitting the jury to conclude DePaepe was not trained on the durational effectiveness of the deicing compound — was in. my view at least minimally sufficient to engender a jury question on the training specification of negligence. I would therefore hold the district court did not err in submitting Instruction 16.
II. Private Industry Standards as Evidence of Negligence.
I also disagree with the majority’s conclusion that the district 'court erred in giving Instruction 20. The majority holds that because Russell Kendzior and Alan Bowman provided different opinions as to the industry safety standards’ applicability, the district court should have permitted the jury to determine whether the ASTM and 'ANSI standards were applicable. This conclusion misunderstands the’ allocation of responsibility between the court and the jury on the issues of duty and breach.
While industry standards may have “no legislative sanction, it is difficult to conceive a better test of care than compliance with [their] provisions.” Smith v. Iowa Pub. Serv. Co., 233 Iowa 336, 337, 6 N.W.2d 123, 123 (1942). As the New Jersey Supreme Court has explained,
A safety code ordinarily represents a consensus -of opinion carrying the approval of a significant segment of an industry. Such a code is not introduced as • substantive law, as proof of regulations or absolute standards having the force of law or of scientific truth. It is offered in connection with expert testimony which identifies it as illustrative evidence of safety practices or rules generally prevailing in the industry, and as such it provides - support for the opinion of the expert cdncerning the proper standard of care.
McComish v. DeSoi, 42 N.J. 274, 200 A.2d 116, 120-21 (1964). In other words, industry standards, if relevant, properly inform the court’s determinations whether the defendant owes a duly to the plaintiff and what that duty is.
The existence of a legal duty and the. scope of that duty are questions of law for the court, not questions of fact for the jury. See, e.g., Van Fossen v. MidAmerican Energy Co., 777 N.W.2d 689, 693 (Iowa 2009); Sweeney v. City of Bettendorf, 762 N.W.2d 873, 880 (Iowa 2009); see also 1 Restatement (Third) of Torts: Liab. for Physical & Emotional Harm § 6 cmt. b, at 67 (2010) [hereinafter Restatement (Third) ]. Thus, the court — not the jury— must decide whether a proffered industry standard is applicable to a given set of facts. See Hansen v. Abrasive Eng’g & Mfg., Inc., 317 Or. 378, 856 P.2d 625, 628 (1993) (en banc) (discussing an ANSI standard and noting “[determination of the appropriate standard of care is an issue of law”). “‘[Applicability1 connotes no ... compulsion to conform with a particular standard. Rather, ‘applicability5 connotes mere relevance....” Keller v. United States, 38 F.3d 16, 26 (1st Cir.1994) (citation omitted). Typically-the court determines applicability of industry standards through rulings in advance of trial or relevance objections' during trial. If a stan *717 dard has no application to the circumstances of the case, it is irrelevant to the court’s duty analysis. See Alter v. Rodgers Mach. Mfg. Co., 268 N.W.2d 830, 840-41 (Iowa 1978) (affirming a trial court’s exclusion of some industry safety standards, in part because some of the standards were for completely different industries and therefore irrelevant).
Marriott notably did not' challenge the applicability of ASTM Standard F1637 or ANSI Standard A1264.2 in its motion in limine, nor did it make a relevance objection at trial when Kendzior relied on the standards during his testimony. Instead, Marriott chose to contest the standards’ applicability through Bowman’s expert opinion. Bowman opined the standards were not applicable to Marriott because they were not binding through state law or a municipal ordinance and because they were developed primarily to address employee — not pedestrian — traction and safety. Both of Bowman’s opinions are without merit.
The ASTM and ANSI standards discussed in this case “have not been given the force of law.” See Jorgensen v. Horton, 206 N.W.2d 100, 103 (Iowa 1973) (concluding industry standards are “not conclusive on the issue of negligence”). But Alcala did not assert negligence per se, so the fact the industry standards do not ' carry the force of law does not mean they have no relevance in this case. See Hansen, 856 P.2d at 628 (concluding an ANSI standard was “relevant to the July’s consideration of whether defendant met the standard of care” even though the standard was “purely advisory and not binding on anyone”); see also Kent Vill. Assocs. Joint Venture v. Smith, 104 Md.App. 507, 657 A.2d 330, 337 (1995) (concluding “the fact that [an ANSI standard has not been officially adopted as a regulation” did not “destroy its relevance as articulating a standard of care”). The majority erroneously attributes a negligence per se claim to Alcala when it states the district court told the jury the standard was violated by icy conditions. The district court did no such thing; it merely told the jury what the standard says and permitted the jury to conclude a violation, if one occurred; was some evidence of negligence.
Likewise, Bowman’s opinion that the standards primarily address employees and not pedestrians does not preclude their relevance to the-existence of a duty or its breach in this case. By analogy, although OSHA regulations normally set forth an obligation only between employers and employees, a violation of OSHA regulations is “evidence of negligence as to all persons who are likely to be exposed to injury as a result of the violation,” even if the person exposed to injury is not an employee. Koll v. Manatt’s Transp. Co., 253 N.W.2d 265, 270 (Iowa 1977); see also Smith v. Kris-Bal Realty, Inc., 242 N.J.Super. 346, 576 A.2d 934, 938 (1990) (“[T]he OSHA code ... may be relied upon to illustrate industry standards and to provide support for the opinion of an expert on the proper standard of care ... even though plaintiff was a business guest at the marina, not a worker.”). The same principle is true here. Even if the ASTM and ANSI standards primarily address employee safety, “there are numerous areas traversed by both” employees and hotel guests — like the outdoor walkway on which Alcala fell. Sorrels v. NCL (Bahamas) Ltd., 796 F.3d 1275, 1282 (11th Cir.2015). Accordingly, even assuming-Bowman’s opinion as to the. primary purpose of the standards is correct, it would not make them irrelevant in determining whether Marriott owed a duty of reasonable care to Alcala under the circumstances of this case. See id. at 1283.
*718 The determination of whether a proffered industry standard is relevant to the existence of a duty under a given set of facts is a question of law for the court— not the jury. See Hansen, 856 P.2d at 628. Thus, in deciding the relevance of industry standards to the existence of a defendant’s duty, the district court must make the decision — as the district court did in this case — even when presented with conflicting expert testimony. Some courts conclude industry standards are applicable and some conclude they are not, depending on the circumstances of the case — but the court decides the question of their relevance. Compare Briere v. Lathrop Co., 22 Ohio St.2d 166, 258 N.E.2d 597, 604 (1970) (concluding the trial judge did not err in determining industry standards were inapplicable “[i]n light of the conflicting testimony about industry adherence to the [proffered] rules”), and Landsiedel v. Buffalo Props., LLC, 112 P.3d 610, 617 (Wyo.2005) (finding no reversible error in the trial court’s “decision not to accept ... industry standards as defining the minimum standard of care” given the parties’ conflicting evidence as to the standards’ applicability), with Dixon v. Int’l Harvester Co., 754 F.2d 573, 582 (5th Cir.1985) (“Although the testimony was in dispute there was substantial evidence to indicate the relevancy of the ANSI standards. ...”), and Eagleburger v. Emerson Elec. Co., 794 S.W.2d 210, 231 (Mo.Ct.App.1990) (en banc) (concluding a decision on ANSI-standards’ relevance “was a determination to be made by the trial court” even though “there was substantial evidence by plaintiffs that the ANSI standards applied ... and substantial evidence by [the defendant] that they did not”).[6]
By giving Instruction 20 in this case, the district court clearly concluded the ASTM and ANSI standards were applicable and therefore relevant to the existence of Marriott’s duty under the circumstances of this case. The majority concludes the instruction was erroneous because it means the court adopted Kendzior’s opinion on applicability over Bowman’s. But because the court, not the jury, decides whether the standards are relevant, that was its prerogative, and because the experts in this case were completely at odds, the district court could not have adopted both experts’ views on relevance. Furthermore, even when a court concludes industry standards are applicable, it does not automatically follow that the court credits an expert’s opinion as to breach of those standards. See Keller, 38 F.3d at 29. A jury could conclude, for example, that noncompliance with relevant industry standards “was excusable, and therefore not negligent.” Morgan v. State, 124 Idaho 658, 862 P.2d 1080, 1083 (1993).
I conclude Kendzior’s expert testimony is substantial evidence amply supporting the district court’s determination that the standards were relevant to Marriott’s duty to exercise reasonable care. Having clari *719 fied the question of relevance of the standards was a question of law for the court, not a question of fact for the jury, I now turn to consider whether , the court committed legal error by concluding ASTM Standard F1637 and ANSI Standard A1264.2 were relevant to the duty issue in this case.
My analysis of this question is slightly more difficult than it might be in other cases because neither party marked the ASTM and ANSI standards and caused them to be made part of the record. Nonetheless, the trial transcript reveals they were presented to the court and shown to the jury via a projector during Kendzior’s testimony. Kendzior read from the standards and Instruction 20 contains verbatim language from them. Additionally, the standards’ substance is published and available to this court. Thus, this is not a case where “the content of the [standard]s is not specified,” which might make us “unable to determine from the record before us the relevance of the sections cited.” Gerace v. 3-D Mfg. Co., 522 N.W.2d 312, 318-19 (Iowa Ct.App.1994).
While we often address industry standards in terms of admissibility, I conclude admission of them as an exhibit is not a condition precedent to their applicability and their relevance to the court’s determination of the existence of a legal duty.-[7] I find support for this conclusion in three cases.
In a Colorado case, the parties debated whether OSHA regulations were applicable. Scott v. Matlack, Inc., 39 P.3d 1160, 1168 (Colo.2002) (en banc). “Specific regulations were not entered into evidence but were discussed extensively by various witnesses.” Id. The court concluded “the jury should .be permitted to hear evidence of [OSHA] regulations as some indication of the standard of care.” Id. at 1170 (emphasis added). The court spoke in terms of “admitting evidence,” but it is clear the evidence came solely — -and permissibly— through testimony, not through an eviden-tiary exhibit. See id. at 1164, 1170.
In a Missouri case, an expert was “not allowed to cite ... specific [standard]s” but did testify that “ANSI standards exist ,.. and that he reviewed and considered those standards” in forming his opinion. Ratcliff v. Sprint Mo., Inc., 261 S.W.3d 534, 550 (Mo.Ct.App.2008). The Ratcliff court found no reversible error resulted from the ruling precluding the expert’s reference to specific standards because the jury heard their substance through the expert’s testimony. See id.
Finally,, we have noted that private safety codes are on occasion a subject of trial testimony even when documents evidencing them are not received in evidence. See Isaacs v. E. Iowa Light & Power Coop., 236 Iowa 402, 408, 19 N.W.2d 208, 211 (1945). In Isaacs, we noted the appellate record did not show a private safety code was offered into evidence. See id. at 408, 19 N.W.2d at 211. We concluded that fact alone resulted in no reversible error given that “some reference in the testimony to said code” was permitted and because compliance with the private safety code was not determinative of the defendant’s compliance with the standard of care. See id. at 408-09, 19 N.W.2d at 211; accord Cronk v. Iowa Power & Light Co., 258 Iowa 603, 612, 138 N.W.2d 843, 848 (1965) (concluding “[ajctionable negligence may exist even though” a defendant complies with an industry standard or private safety code),
*720 I conclude Alcala adequately presented the ASTM and ANSI standards at issue in this case in the district court so that the court could determine whether they were relevant to the existence of Marriott’s duty of care. Cf. Porter v. Omni Hotels, Inc., 260 Ga.App. 24, 579 S.E.2d 68, 71 (2003) (concluding a plaintiff did not show an ANSI standard applied when he neither placed the standard into evidence nor presented expert testimony regarding the standard).
After reviewing the language of the standards discussed by the experts at trial and incorporated in Instruction 20,1 would hold the district court did not err in finding them applicable and relevant to Marriott’s duty of care. The ANSI standard clearly addresses snow and ice removal from pedestrian walkways. It is not part of a statute or ordinance, but the district court instructed the jury only that it could consider violation of the standard as evidence of negligence.
The ASTM standard is a closer question. ' Marriott contends Standard F1637 addresses only construction materials and design, so the notion that walkways must be slip resistant and that a slippery exterior walkway is substandard evaluates only the characteristics of the construction material used to build the walkway (in this case concrete), not any effects of weather on the walkway. That position has some intuitive appeal; but section 1.1 of Standard F1637 addresses construction standards and “minimum maintenance criteria.” Furthermore, the standard also provides walkways should be slip resistant under “expected environmental conditions and use.” Notably, the standard does not expressly exclude from its scope this particular class of persons, property, or circumstances. Cf. Lynch v. Reed, 284 Mont. 321, 944 P.2d 218, 224 (1997) (concluding an ANSI construction. standard was inapplicable because the provision setting forth the scope of the standard expressly stated the standard 'did not apply to residential projects); Kalish v. HEI Hosp., LLC, 114 A.D.3d 444, 980 N.Y.S.2d 80, 82 (2014) (noting Standard F1637 “specifically identifies] bath tubs and showers as beyond the scope of the practices contained therein”). Nor is the standard obviously inapplicable because it is directed at an entirely different industry. Cf. Alter, 268 N.W.2d at 840-41 (concluding “safety standards in the metalworking industry” were inapplicable and irrelevant in a case involving the, woodworking industry).- Although ASTM Standard F1637 is couched in much more general terms than the ANSI standard, I conclude the district court did not err in finding it relevant to the court’s determination of Marriott’s duty and to the jury’s determination of negligence. See Williams v. Crane, No. 2:14-CV-241 TS, 2015 WL 7176370, at *2 (D.Utah Nov. 13, 2015) (concluding, in a slip-and-fall- case involving snow and ice, that “the ASTM Standard Practice for Safe Walking Surfaces” — which is number F1637 — “may be helpful to the jury in determining reasonable safety practices for safe walking surfaces”). Accordingly, the district court did not err in giving Instruction 20.
C. Continuing Storm. The district court concluded the continuing-storm doctrine had no application under the facts of this case and declined Marriott’s request for an instruction. Although the majority does not reach this issue, I conclude that, even without reaching, the doctrine’s continued vitality under , the Restatement (Third), the district court did not err and should be affirmed.
We adopted the continuing-storm doctrine in 1953. Reuter v. Iowa Tr. & Sav. Bank, 244 Iowa 939, 943, 57 N.W.2d 225, 227 (1953). I generally agree with the ma- *721 Jonty’s recitation of the history of the doctrine in Iowa, but I offer one additional point: There is a difference between a claim challenging the timing of snow removal efforts and a claim challenging the manner of snow removal efforts. Wailes v. Hy-Vee, Inc., 861 N.W.2d 262, 267 (Iowa Ct.App.2014). A claim challenging the manner of snow removal is not subject to the continuing-storm doctrine because it merely seeks to enforce “the general rule that an actor ordinarily has a duty to exercise reasonable care when the actor’s conduct creates a risk of physical harm.” Id.; see 1 Restatement (Third) § 7(a), at 77; see also Robinson v. Park Cent. Apartments, 248 F.Supp. 632, 635 (D.D.C.1965) (“The defendants undertook the task of clearing the sidewalk.... Even if there was no legal duty to do so, once a person voluntarily undertakes to perform a task, he [or she] is held to the requirement that it should be done free of negligence....”); Estep v. B.F. Saul Real Estate Inv. Tr., 843 S.W.2d 911, 914 (Ky.Ct.App.1992) (“In this case, [the land occupiers] opted to attempt to clear their lot and sidewalks of ice and snow— Since they chose to so act, they must act in a reasonable manner or be liable for their failure.”); Danner v. Myott Park, Ltd., 209 Neb. 103, 306 N.W.2d 580, 583 (1981) (reversing a verdict in a defendant’s favor, remanding for new trial, and disapproving of the continuing-storm instruction the trial court gave because it erroneously allowed the jury , to find “that improper clearing of snow and ice ... was of no consequence because defendant had a right to wait until the end of the storm before doing anything at all”). Because I conclude the evidence here did not justify a continuing-storm instruction in any event, I find it unnecessary to decide whether Alcala challenges the timing or manner (or both) of Marriott’s snow and ice removal.
We have not had occasion to define the word “storm” precisely,[8] nor have we prescribed an outer limit of what might be considered a reasonable time for removing snow or ice from walkways after a storm ends under thé continuing-storm doctrine. See Frykman v. Univ. of Minn.-Duluth, 611 N.W.2d 379, 381 (Minn.Ct.App.2000) (declining to resolve a case as a matter of law because the facts did not establish “a clear-cut storm incident”); see also Batie v. City of Humboldt, 228 Iowa 528, 532-33, 292 N.W. 857, 859 (1940) (declining, in a pre-Reuter case, to conclude three hours between the end of a snowstorm and a plaintiffs fall was as a matter of law an unreasonable delay in addressing the hazard). However, in considering whether the evidence in this case supports Marriott’s requested continuing-storin instruction, I keep in mind the rule’s purpose and animating principle, as this court does in many other contexts. See, e.g., Baker v. Bridgestone/Firestone, 872 N.W.2d 672, 678 & n. 4 (Iowa 2015) (acknowledging the longstanding principle that the “humanitarian and beneficent purpose” of workers’ compensation statutes informs our interpretation of them); Iowa Supreme Ct. Att’y Disciplinary Bd. v. Howe, 706 N.W.2d 360, 378 (Iowa 2005) (keeping in mind “the underlying purposes of attorney discipline” when determining a sanction for ethical misconduct); Renander v. Inc., Ltd., 500 N.W.2d 39, 42 (Iowa 1993) (declining to interpret a statute to “expand the legislature’s harrow phrpose”).
The rule’s purpose is essentially to prevent land occupiers from having to undertake Sisyphean tasks every time it snows. *722 See Reuter, 244 Iowa at 943, 57 N.W.2d at 227. But not every weather event thwarts cleanup. See Powell v. MLG Hillside Assocs., L.P., 290 A.D.2d 345, 737 N.Y.S.2d 27, 29 (2002). “[I]f the storm has passed and precipitation has tailed off to such an extent that there is no longer any appreciable accumulation, then the rationale for continued delay abates, and common sense would dictate that the rule not be applied.” Id. A weather event not presenting an ongoing deluge of subzero temperatures and blowing and drifting snow, see Olejniczak v. E.I. du Pont de Nemours & Co., 79 F.Supp.2d 209, 217 (W.D.N.Y.1999), freezing rain, see Rockford v. G.K. Dev., Inc., 845 N.W.2d 715, 718 (Iowa Ct.App.2014), or slush and snow pedestrians might track into a building’s vestibule, see Parsons v. H.L. Green Co., 233 Iowa 648, 648-49, 10 N.W.2d 40, 41 (1943), does not present the kinds of changing conditions the continuing-storm doctrine addresses. See Reuter, 244 Iowa at 943, 57 N.W.2d at 227.
Courts in other jurisdictions have addressed allegedly ongoing storms and concluded a lack of changing conditions might render the continuing-storm doctrine inapplicable. For example, in Powell, the court found it important in rejecting the doctrine’s application that “there was nothing more than trace amounts of precipitation during the two hour and 20 minute period ... prior to the accident.” 737 N.Y.S.2d at 29. In another New York ease, the court questioned whether the analogous storm-in-progress rule applied when there was a two-hour window “between the cessation of freezing rain and the accident” during which normal (not freezing) rain fell. Vosper v. Fives 160th, LLC, 110 A.D.3d 544, 973 N.Y.S.2d 589, 590 (2013).
Of course, the continuing-storm doctrine “does not foreclose submission to the jury, on a proper evidentiary foundation, of the factual determination! ] of whether a storm has ended.” Kraus v. Newton, 211 Conn. 191, 558 A.2d 240, 243-44 (1989). In one Connecticut case, the court found sufficient the evidentiary foundation for a requested continuing-storm instruction because “climatological records ... detailed a number of different types of weather between 7 a.m. and 4 p.m. on the day of the plaintiffs fall, including light snow, freezing rain, heavy rain, light rain and mist.” Umsteadt v. G.R. Realty, 123 Conn.App. 73, 1 A.3d 243, 248 (2010). However, when I evaluate this record while keeping in mind the continuing-storm doctrine’s, purpose, I conclude the district court correctly rejected the proposed instruction in this case.
The certified weather records in this case unquestionably show mist continuing from January 20 through the morning of January 21 in Moline and mist at some point on January 21 in Davenport. While those locations are a few miles from Bet-tendorf, we have long acknowledged that a certified weather record from a nearby observation point is “competent and relevant” evidence “for the purpose of showing the temperature and snowfall during the time it purports] to cover.” Huston v. City of Council Bluffs, 101 Iowa 33, 39, 69 N.W. 1130, 1131 (1897) (accepting weather records from Omaha, Nebraska as indicative of weather in Council Bluffs, Iowa during the same time). But the mist did not present the types of changing conditions undergirding the continuing-storm doctrine. By 7:00 p.m. on January 20, over twelve hours before Alcala fell, the weather system was no longer producing measurable quantities of precipitation in nearby Moline and Davenport; nor did it feature other phenomena — like strong gusts of wind or blowing snow — that would have made cleanup and sidewalk safety precautions impractical.
*723 Meteorological data from nearby Moline indicates no accumulations of precipitation after 7:00 p.m. on January 20. At most, the data from Davenport indicates a trace amount of precipitation was observed on January 21. But the Davenport data lacks temporal specificity, so if the district court had given Marriott’s requested instruction, the jury would have had to speculate that the trace accruing on January 21 occurred before Alcala fell around 8:00 a.m. “[S]peculation is not substantial evidence.” Sleeth v. Louvar, 659 N.W.2d 210, 215 (Iowa 2003); cf. La Due v. G & A Grp. Inc., 241 A.D.2d 791, 660 N.Y.S.2d 215, 216 (1997) (declining to grant summary judgment based on the storm-in-progress rule because while it was undisputed some snowfall occurred “on the date of plaintiffs accident, the meteorological records do not demonstrate the specific hours during which the snow fell”). Furthermore, the Davenport data reflects 0.01 inches of precipitation on January 25. Thus, the trace amounts on January 21 totaled even less than that. I would conclude as a matter of law that precipitation totaling less than 0.01 inches on January 21 did not impede Marriott’s efforts to clear the ice from the sidewalk.
Indeed, the fact that Marriott claims to have made repeated efforts to clear ice and snow after all accumulation associated with the storm event stopped is compelling evidence that the weather in the early morning hours of January 21 posed no obstacle making removal of ice from Marriott’s sidewalk impractical. This is not a case where a land occupier tried once in vain to clear a path but howling winds and relentless snowfall forced them inside to await the storm’s passage, or a case where “[a] fairly warm autumn day ... suddenly changed into a freezing winter’s evening by an outburst of elemental fury.” Parks v. City of Des Moines, 195 Iowa 972, 983, 191 N.W. 728, 733 (1923) (De Graff, J., dissenting). Rather, Marriott’s employees attempted to clear — or at least represented that they did clear — the sidewalks at least six times between 6:00 p.m. on January 20 and 6:00 a.m. on January 21.
Nor did the lay testimony about the weather conditions on January 21 constitute substantial evidence supporting a continuing-storm instruction. Like the district court, I would conclude the majority of statements — for example, that “it was quite icy” and “there were accidents all over town” — simply described the effects of the January 20 storm event, not its continuation at a time material to Alcala’s fall. At best, one or two witnesses testified that there was mist in the air on the morning of January 21. But I find no substantial evidence in this record tending to prove the weather was so inclement as to make it impractical to clear Marriott’s sidewalk of ice before Alcala fell. Accordingly, I find no error in the district court’s refusal to give the continuing-storm instruction Marriott requested.
Finding no error in the instructions given by the district court, I would vacate the decision of the court of appeals and affirm the district court judgment in Alcala’s favor.
WIGGINS and APPEL, JJ., join this concurrence in part and dissent in part.

. It comes as no surprise that Marriott did not deny it owed a duty to exercise reasonable care in training its employees on the subject of removing ice from its sidewalks. Under section 7(a) of the Restatement (Third) of Torts, an “actor ordinarily has a duty to exercise reasonable care when the actor’s conduct creates a risk of physical harm.” 1 Restate *713 ment (Third) of Torts: Liab. for Physical & Emotional Harm § 7(a), at 77 (2010) [hereinafter Restatement (Third)]; see Thompson v. Kaczinski, 774 N.W.2d 829, 835 (Iowa 2009) (adopting the Restatement (Third)’s duty framework). "Thus, in cases involving physical harm, courts ordinarily need not concern themselves with the existence or content of this ordinary duty. They may proceed directly to the elements of liability.....” 1 Restatement (Third) § 6 cmt. f at 69. Those four elements of a prima facie claim for negligence are "(1) failure to exercise reasonable care; (2) factual cause; (3) physical harm; and (4) harm within the scope of liability (which historically has been called 'proximate cause’).” Id. § 6 cmt. b, at 67-68, Thus, Alcala had no burden to present express testimony that Marriott owed a duty to exercise reasonable care in training its employees on the .proper methods of clearing ice from its sidewalks.

. Although expert testimony was not required to justify submission of the issue to the jury, it would of course have been admissible. In a 1963 slip-and-fall case where the fall occurred on an indoor dance floor, we concluded a court properly admitted expert, testimony from those familiar with "care of waxed floors and the safe practices in wax application thereon.” Smith v. Cedar Rapids Country Club, 255 Iowa 1199, 1210, 124 N.W.2d 557, 564 (1963). The testimony was helpful because it aided jurors in understanding the interplay between the particular chemical used and the material comprising the dance floor on which the injury occurred, as well as "the proper application and slipperiness of” the floor wax. Id. at 1211, 124 N.W.2d at 564. However, -Smith does not stand for the proposition that expert testimony was required in this case on the question whether Marriott breached its duty to train its employees properly. First, I believe laypeople are more familiar with ice, déicer, and concrete sidewalks than the properties of the floor wax when applied to the flooring material at issue in that case. Secondhand moré importantly, we concluded in Smith only that expert testimony was permissible, not that it was required to engender, a jury question. See id. at 1210-11, 124 N.W.2d at 564-65; accord Boham v. City of Sioux City, 567 N.W.2d 431, 437 (Iowa 1997) (concluding expert testimony about crossing guard training was sufficient— not that it was required — to support a failure-to-train specification of negligence).

. I acknowledge the highest court in New York has reached a different conclusion. See Sawyer v. Dreis & Krump Mfg. Co., 67 N.Y.2d 328, 502 N.Y.S.2d 696, 493 N.E.2d 920, 925 (1986) ("The ANSI requirements ... could be considered by the jury as some evidence of negligence if it first found that the standards set forth in the booklet represented the general custom or usage in the industry.”). Accordingly, federal district courts applying New York law have also left the question of relevance of industry standards to the jury, See Almonte v. Averna Vision & Robotics, Inc., 128 F.Supp.3d 729, 744 (W.D.N.Y.2015); Rupolo v. Oshkosh Truck Corp., 749 F.Supp.2d 31, 43 (E.D.N.Y.2010). My research reveals that many other courts addressing the question take a different approach allocating to the court the responsibility of deciding the relevance of industry standards to the existence of a duty. I find that approach consistent with the traditional allocation of responsibility between the court and the jury and would therefore adopt it in this case.

. Although admitting industry standards as an evidentiary exhibit is not a condition precedent to the court’s consideration of them in its determination of the duty question, I encourage the bench and bar in future cases to mark and identify them for inclusion in the record.

. In particular, we have not been called upon to decide how severe a weather event must be to support a continuing-storm instruction.