# IN THE SUPREME COURT OF IOWA

No. 12–0302

Filed May 9, 2014

**ALAN ASHER** and **LARYSA ASHER,** as Parents and Next Friends of
ALEXANDRA ASHER, a minor, and **ALAN ASHER** and **LARYSA ASHER,**
Individually,

 Appellees,

vs.

**OB-GYN SPECIALISTS, P.C.,** and **ANTHONY A. ONUIGBO, M.D.,**

 Appellants.

Appeal from the Iowa District Court for Black Hawk County,
Thomas N. Bower, Judge.

Defendants in a medical negligence action appeal a jury verdict.
**AFFIRMED.**

David L. Baker, Cedar Rapids, and James A. Gerk and Christine L.
Conover of Simmons Perrine Moyer Berman PLC, Cedar Rapids, for
appellants.

Mark McCormick of Belin McCormick, P.C., Des Moines, and
H. Daniel Holm Jr., Max E. Kirk, and Eashaan Vajpeyi of Ball, Kirk &
Holm, P.C., Waterloo, for appellees.

**APPEL, Justice.**

In this professional negligence action, we consider whether the district court committed reversible error by providing the jury with a causation instruction based upon the Restatement (Second) of Torts rather than an instruction based upon the Restatement (Third) of Torts, as adopted by this court in *Thompson v. Kaczinski,* 774 N.W.2d 829, 839 (Iowa 2009). We also consider whether substantial evidence supported submission of two specifications of negligence to the jury, one based on a physician's use of a vacuum extractor during the delivery of a baby and another based on the physician's failure to keep adequate documentation of the labor and delivery process.

For the reasons expressed below, we conclude that although the district court should have submitted a causation instruction based upon the Restatement (Third) of Torts and *Thompson,* the error was harmless under the facts and circumstances of this case. We further conclude substantial evidence supported submission of the two challenged specifications of negligence to the jury.

### I. Factual Background and Proceedings.

**A. Overview of Proceedings.** Larysa Asher was admitted to Covenant Medical Center (Covenant) in Waterloo for the delivery of a baby. The physician providing delivery services at Covenant was Dr. Anthony A. Onuigbo. Unfortunately, the baby was born with a brachial plexus injury and broken clavicle. Asher and her husband filed an action individually and as parents and next friends of their minor child, asserting Onuigbo was negligent in connection with the delivery of the baby.[1]

---

[1]We will refer to the Ashers jointly as "Asher."

After substantial discovery and a two-week trial, the district court instructed the jury. Instruction No. 12 asserted Asher had to prove Onuigbo was negligent in at least one of the following ways:

> A. In failing to document the progress of descent during the second stage of Larysa Asher's labor;
>
> B. Using a [vacuum extractor] to assist in the delivery of [the baby];
>
> C. In failing to perform a cesarean section on Larysa Asher for the purpose of delivering [the baby];
>
> D. In failing to recognize and diagnose [the baby's] shoulder dystocia;
>
> E. In failing to perform proper maneuvers to deliver [the baby] after she developed shoulder dystocia;
>
> F. By applying excessive lateral and/or rotational traction to [the baby's] head in an effort to deliver her.

Instruction No. 12 further informed the jury it could award damages only if it found Onuigbo's negligence was a proximate cause of the damage. Onuigbo objected to the instruction, arguing Asher failed to present substantial evidence of a causal link between any failure to document and the alleged harm or the use of the vacuum extractor and the alleged harm.

The district court also instructed the parties on causation. Instruction No. 13 instructed the jury as follows:

> The conduct of a party is a proximate cause of damage when it is a substantial factor in producing damages and when the damage would not have happened except for the conduct.
>
> "Substantial" means the party's conduct has such an effect in producing damage as to lead a reasonable person to regard it as a cause.

Onuigbo objected to Instruction No. 13 on the ground that while it would have been proper in the past, *Thompson* substantially altered the law of causation and the instruction did not reflect the current state of the law.

The jury found in favor of Asher and awarded substantial damages. After the district court denied Onuigbo's posttrial motions, he appealed. On appeal, Onuigbo claims Instruction No. 13 inaccurately reflected the current state of the law in light of *Thompson* and, as a result, the judgment must be vacated and the case remanded for a new trial. Onuigbo also claims there was insufficient evidence to support a finding of negligence based upon the failure to document the progress of the fetus's descent through the birth canal during the second stage of labor or the use of the vacuum extractor to assist in the delivery. Onuigbo argues that because the jury returned a general verdict and it is not possible to determine whether the verdict was based upon a valid theory of negligence, the verdict cannot stand.

**B. Overview of Trial Record.** Because we are reviewing whether substantial evidence supported submission of certain instructions to the jury, we view the evidence in the light most favorable to the party advocating submission of the instructions. *See Hoekstra v. Farm Bureau Mut. Ins. Co.*, 382 N.W.2d 100, 107–08 (Iowa 1986). Viewing the facts in the light most favorable to Asher, a reasonable jury could have found the facts as follows.

Larysa began experiencing contractions on the morning of November 7, 2006. Her husband drove her to Covenant, where they arrived at approximately 7:05 a.m. At 10:00 p.m., Larysa's medical chart indicates she was completely dilated, meaning the first stage of her labor was complete. Though there had been some documentation of the fetus's station, or position, in the birth canal prior to this time, as recently as

8:00 p.m., there was no documentation of the fetus's station at 10:00 p.m. From this point until the birth of the baby at 2:26 a.m., there was no further documentation of the fetus's station, although either Onuigbo or another member of the medical team performed vaginal exams at 11:54 p.m. and 1:47 a.m.

Larysa experienced a protraction disorder during the first and second stages of labor. A protraction disorder occurs when the fetus's descent through the birth canal proceeds at an unusually slow rate. The severe protraction of the second stage of labor indicated the fetus was having trouble moving past the pelvic bone. During the second stage of labor, Onuigbo breached the standard of care by not performing enough vaginal examinations and by not documenting the progress of the labor and the station of the fetus in the birth canal.

The protracted labor and lack of adequate progress posed a risk of harm to the baby. Onuigbo did not discuss the risk of harm with his patient. Onuigbo then used a vacuum extractor to help draw the baby into position for delivery. The baby's shoulder became lodged against Larysa's pubic bone, a condition known as shoulder dystocia. Instead of performing maneuvers to free the lodged shoulder, Onuigbo applied lateral traction, causing injury to the baby's brachial plexus nerves.

## II. Standard of Review.

"We review a claim that the district court gave an instruction not supported by the evidence for correction of errors at law." *Pavone v. Kirke,* 801 N.W.2d 477, 494 (Iowa 2011). " 'We review the related claim that the trial court should have given the defendant's requested instructions for an abuse of discretion.' " *State v. Marin,* 788 N.W.2d 833, 836 (Iowa 2010) (quoting *Summy v. City of Des Moines*, 708 N.W.2d 333, 340 (Iowa 2006)). The trial court commits legal error "when it

materially misstates the law." *Anderson v. Webster City Cmty. Sch. Dist.*, 620 N.W.2d 263, 265 (Iowa 2000). An error in giving an instruction "does not warrant reversal unless the error is prejudicial to a party." *Herbst v. State*, 616 N.W.2d 582, 585 (Iowa 2000). "Errors in jury instructions are presumed prejudicial unless 'the record affirmatively establishes there was no prejudice.' " *State v. Murray*, 796 N.W.2d 907, 908 (Iowa 2011) (quoting *State v. Hanes*, 790 N.W.2d 545, 551 (Iowa 2010)). " 'When the error is not of constitutional magnitude, the test of prejudice is whether it sufficiently appears that the rights of the complaining party have been injuriously affected or that the party has suffered a miscarriage of justice.' " *Marin*, 788 N.W.2d at 836 (quoting *State v. Gansz*, 376 N.W.2d 887, 891 (Iowa 1985)).

When a jury returns a verdict based upon a specification of negligence, there must be substantial evidence to support the verdict. *See Vachon v. Broadlawns Med. Found.*, 490 N.W.2d 820, 822 (Iowa 1992) ("The submission of instructions upon issues that have no support in the evidence is error."); *see also City of Cedar Falls v. Cedar Falls Cmty. Sch. Dist.*, 617 N.W.2d 11, 16 (Iowa 2000) (finding substantial evidence supported findings of negligence under multiple specifications). Evidence is substantial enough to support a specification of negligence where "a reasonable mind would accept it as adequate to reach a conclusion." *Bride v. Heckart*, 556 N.W.2d 449, 452 (Iowa 1996). In considering whether the instruction is supported by substantial evidence, we give the evidence the most favorable construction it will bear in favor of supporting the instruction. *See Hoekstra*, 382 N.W.2d at 107–08. Where the district court submits to the jury a specification of negligence not supported by the evidence and the jury returns a general verdict, reversal is required. *Nichols v. Westfield Indus., Ltd.*, 380 N.W.2d

392, 396–97 (Iowa 1985); *Childers v. McGee*, 306 N.W.2d 778, 780 (Iowa 1981).

### III. Discussion of the Causation Instruction.

**A. Positions of the Parties.** Onuigbo maintains Instruction No. 13 was erroneous and should not have been given. Onuigbo's argument is rooted in *Thompson.* In *Thompson,* we noted the formulation of proximate cause by way of a substantial-factor test in prior law "ha[d] been the source of significant uncertainty and confusion." 774 N.W.2d at 836. As a result, we adopted the standard as articulated by the drafters of the Restatement (Third) of Torts. *Id.* at 839. Under the Restatement (Third) of Torts, factual cause and scope of liability (a more nuanced term for what was previously known as proximate cause) are addressed separately. *Id.* at 837; *see also* Restatement (Third) of Torts: Liab. for Physical & Emotional Harm, ch. 6, Special Note on Proximate Cause, at 492 (2010) [hereinafter Restatement (Third)]. *Compare* Restatement (Third), ch. 5, at 346–491 (factual cause), *with id.* ch. 6, at 492–604 (scope of liability). As a result, Onuigbo contends the district court misstated the law when it gave a causation instruction based on the substantial-factor test. Onuigbo notes the district court believed the approach to scope of liability and factual cause of the Restatement (Third) did not apply in a medical malpractice case, a belief Onuigbo argues is incorrect.

Asher recognizes this court adopted the approach to causation of the Restatement (Third) in *Thompson* and agrees with Onuigbo that it should apply in medical malpractice cases. Asher further agrees that under the Restatement (Third), causation analysis is now separated into scope of liability and factual cause. Asher maintains, however, the question of whether certain harm is within an alleged tortfeasor's scope

of liability is often established as a matter of law, thus avoiding the need to instruct the jury on scope of liability. Asher cites comment *a* to section 29 of the Restatement (Third), which provides:

> Ordinarily, the plaintiff's harm is self-evidently within the defendant's scope of liability and requires no further attention. Thus, scope of liability functions as a limitation on liability in a select group of cases, operating more like an affirmative defense, although formally it is not one.

Restatement (Third) § 29 cmt. *a*, at 493–94. Asher also points to a committee comment to instruction 700.3A of the Iowa State Bar Association Civil Jury Instructions on scope of liability, which states:

> In most cases, scope of liability will not be in dispute or will be adjudicated by the court on a dispositive motion. This instruction should be given only if under the facts of the particular case scope of liability is a question for the jury.

Iowa State Bar Ass'n, Iowa Civil Jury Instruction 700.3A cmt. (2012).

Asher maintains that in this case, scope of liability was not in dispute and required no further attention. She notes that in order to show the alleged harm was within the scope of liability, the harm must arise from "the same general types of danger that the defendant should have taken reasonable steps . . . to avoid." *See id.* 700.3A. Asher further notes that in making the determination of whether the harm was within the scope of liability, the fact finder should consider whether "repetition of [the] defendant's conduct makes it more likely harm of the type plaintiff claims to have suffered would happen to another." *Id.*

Applying these standards, Asher argues Onuigbo's scope of liability was established as a matter of law. She notes the harm to the baby, a brachial plexus injury, is among the harms that result from mismanagement of the delivery of a baby. Asher further asserts that if the acts she alleged were to be repeated—such as failure to document

progress or use of the vacuum extractor—it is more likely the same harm that occurred in this case would happen to other babies. Because scope of liability under the Restatement (Third) was established as a matter of law, Asher contends, the giving of an erroneous proximate cause instruction was not a material error.

In the alternative, Asher argues that while Instruction No. 13 may have been erroneously given, any error was harmless. Asher maintains the substantial-factor instruction imposed an additional barrier to liability no longer sanctioned by Iowa law. In other words, Asher claims the erroneous instruction was harmless because a jury that found the substantial-factor test in Instruction No. 13 was satisfied would have necessarily found that the harm was within Onuigbo's scope of liability under the Restatement (Third).

**B. Analysis.** In *Thompson,* this court considered the law of causation in a negligence action involving physical harm. High winds blew a disassembled trampoline across a yard and into a roadway, where it came to rest. 774 N.W.2d at 831. Later that day, a motorist who encountered the trampoline in the road was injured when he swerved to avoid it and crashed into a ditch. *Id.* at 831–32.

We began by noting that a trial court instructing a jury on causation in accordance with the Restatement (Second) of Torts would instruct the jury that " '[t]he actor's negligent conduct is a legal cause of harm to another if (a) his conduct is a substantial factor in bringing about the harm, and (b) there is no rule of law relieving the actor from liability.' " *Id.* at 836 (quoting Restatement (Second) of Torts § 431, at 428 (1965) [hereinafter Restatement (Second)]). We then noted this traditional approach caused "significant uncertainty and confusion." *Id.*; *see also Gerst v. Marshall,* 549 N.W.2d 810, 816–18 (Iowa 1996)

(chronicling this court's inconsistent approach to proximate causation). To eliminate the uncertainty and confusion, we observed that the drafters of the Restatement (Third) addressed factual cause and what was formerly known as proximate cause (and now called scope of liability) separately. *Thompson*, 774 N.W.2d at 837.

Although sometimes labeled "medical malpractice" actions, a claim that a professional has failed to meet the applicable standard of care is essentially a negligence cause of action. *See Kemin Indus., Inc. v. KPMG Peat Markwick LLP*, 578 N.W.2d 212, 221 (Iowa 1998). Nothing in the Restatement (Third) suggests its approach to factual causation and scope of liability does not apply to a claim of medical negligence. The introduction to the Restatement (Third) indicates it generally covers negligence actions. *See* Restatement (Third) Intro., at 1. Restatement (Third) section 26, comment *n* discusses the applicability of the loss of chance doctrine in medical malpractice actions. *Id.* § 26 cmt. *n*, at 356–57. Restatement (Third) section 35, comment *a* uses an example of a negligent medical professional in discussing the medical professional's scope of liability. *Id.* § 35 cmt. *a*, illus. 1, at 592–93. Further, we can discern no reason to except medical negligence actions from the factual cause and scope of liability approach of the Restatement (Third). As a result, we conclude the district court erred in submitting Instruction No. 13 to the jury because it instructed the jury based upon the substantial-factor approach of the Restatement (Second).

Nonetheless, we conclude any error in submitting the instruction was harmless. We agree with Asher that in most cases the alleged tortfeasor's scope of liability will not be an issue and this case provides a good example of that. A brachial plexus injury is the kind of harm one might expect to be more likely to occur if a delivering physician, like

*Onuigbo*, was negligent in the manner alleged by Asher. But a reasonable jury could find repetition of Onuigbo's conduct makes it more likely the type of harm Asher claims to have suffered would happen to another. Thus, Onuigbo's scope of liability was established as a matter of law. Of course, whether the alleged negligence is a factual cause of the harm remains an open question for the jury to decide.

In any event, the error in this case was not prejudicial. In *Thompson*, we noted one point of confusion caused by stating the concept of proximate cause through a substantial-factor test is that a juror might misunderstand proximate cause to mean the singular cause nearest in time or location to the injury. 774 N.W.2d at 837; Restatement (Third) § 29 cmt. *b*, at 494. Thus, a juror could conclude the act of negligence must be in the same location as the harm, that there might be only one legal cause of the injury, or that the cause must be the last substantial factor in a chain. These factors tend to increase, not decrease, barriers to liability. *See Matsuyama v. Birnbaum*, 890 N.E.2d 819, 842–43 (Mass. 2008) (concluding a requirement that the plaintiff prove negligence was a substantial contributing factor in a death arguably imposed a higher burden than requiring the plaintiff to prove negligence reduced the chances of survival). This would effectively raise the plaintiff's burden by creating a more demanding scope-of-liability standard. At the same time, a situation may be conceivable in which alleged negligent conduct is a substantial factor in bringing about harm, but nonetheless the harm is not within the actor's scope of liability. In that case, a substantial-factor instruction would effectively decrease the plaintiff's burden to show the conduct was within the actor's scope of liability.

Here, we can easily conclude the erroneous substantial-factor instruction created a more demanding instruction than the proper Restatement (Third) scope-of-liability instruction. The brachial plexus injury was established as a matter of law to be within Onuigbo's scope of liability. Therefore, submission of any instruction on causation to the jury beyond one pertaining only to factual causation increased Asher's burden by making it more difficult for her to obtain a favorable verdict. Because the jury found in favor of Asher notwithstanding her increased burden, the error was not prejudicial and does not constitute reversible error. *See Hagenow v. Schmidt*, 842 N.W.2d 661, 677 (Iowa 2014) (concluding error was harmless where the defendant prevailed on the sudden-emergency defense and the district court's wording of the sudden-emergency instruction made it more difficult to prove the defense).

**IV. Substantial Evidence of Causation Regarding Use of the Vacuum Extractor.**

**A. Positions of the Parties.** Onuigbo claims Asher failed to produce substantial evidence that his use of the vacuum extractor caused the injury in this case. Onuigbo emphasizes that even Asher's experts testified the use of the vacuum extractor did not cause any injury to the baby. Onuigbo points to expert testimony indicating that the vacuum extractor was simply used to pull the baby's head outside the vulva and that the instrument itself did not cause injuries.

Asher responds that there was substantial evidence that Onuigbo's election to use the vacuum extractor increased the chance the baby would develop shoulder dystocia. Further, Asher notes there is no legal requirement that Onuigbo's use of the vacuum extractor directly cause the injury or be the sole cause of the injuries. If Onuigbo had recognized

the shoulder dystocia caused by the vacuum extractor, Asher argues, he could have performed maneuvers to free the shoulder from the pubic bone. Instead, Asher points out, Onuigbo applied lateral traction to deliver the baby, causing the brachial plexus injury.

**B. Analysis.** We agree with Onuigbo the use of the vacuum extractor itself did not directly cause the injury to the baby. However, a reasonable jury could conclude that using the vacuum extractor led to the shoulder dystocia, that Onuigbo failed to diagnose the shoulder dystocia, and that when Onuigbo subsequently applied traction to deliver the baby, the injury occurred. It is not necessary that an act of negligence be the last link in the causal chain leading to injury to establish factual causation. Under the Restatement (Third), "Conduct is a factual cause of harm when the harm would not have occurred absent the conduct." Restatement (Third) § 26, at 346. Comment *c* to this section elaborates on the principle, noting that there can be multiple causes of injury in a chain of events. *Id.* § 26 cmt. *c*, at 347–48. We have long held an alleged negligent act or omission must be the direct instrumentality of harm. *See, e.g., State v. Tribble*, 790 N.W.2d 121, 127 & n.2 (Iowa 2010) (noting that when multiple causes are present, each sufficient to cause the injury, each is a factual cause of the harm). Asher's experts testified the use of a vacuum extractor significantly increased the risk of shoulder dystocia, which in turn led to the brachial plexus injury when lateral traction was applied. Based on the Asher's expert testimony in this case, a reasonable jury could find Onuigbo's use of the vacuum extractor set in motion a series of events leading to the brachial plexus injury. As a result, the district court did not err in submitting the specification of negligence based upon Onuigbo's use of the vacuum extractor.

**V. Substantial Evidence of Causation on Failure to Document Progress of Labor.**

**A. Positions of the Parties.** Onuigbo contends the evidence was insufficient to support a specification of negligence based upon his failure to adequately document the progress of the labor. Onuigbo asserts the reason for maintaining adequate documentation is to ensure other physicians who might assume responsibility for the delivery have an adequate and accurate history to rely upon. In this case, however, Onuigbo was the only physician attending Larysa during her labor. Further, Onuigbo claims the failure to document the baby's station did not cause anything except a less-documented chart. Onuigbo argues no reasonable jury could conclude the failure to write information on pieces of paper caused the brachial plexus injury.

Asher argues the evidence established Onuigbo's failure to document the progress of labor consistent with the standard of care. Asher further claims that had the labor been properly documented, a reasonable jury could conclude the injuries to the baby would not have occurred. If Onuigbo had maintained proper documentation, Asher asserts, Onuigbo would have recognized the protracted nature of each stage of labor. Asher argues that in order to evaluate the risk of a traumatic vaginal delivery, Onuigbo should have assessed and documented the fetus's descent every hour during the second stage of labor.

**B. Analysis.** Expert testimony is ordinarily required on causation in medical negligence cases. *See Doe v. Cent. Iowa Health Sys.*, 766 N.W.2d 787, 792 (Iowa 2009) ("The longstanding Iowa rule is that in a tort action the necessity of expert testimony or the quality of necessary expert testimony determines whether substantial evidence supports the submission of the causal relationship between the act of the wrongdoer

and the injury."). There is, however, an exception to the general rule. Expert medical testimony is not required on causation where an untrained lay person would be qualified through ordinary knowledge and experience to determine the issue. *Id.* at 793; *see also Stickleman v. Synhorst*, 243 Iowa 872, 878–79, 52 N.W.2d 504, 508 (1952) (finding it to be within the realm of common layperson knowledge that one can suffer serious blood loss due to a puncture wound to the neck). Regardless of whether causation requires an expert, causation cannot be established through guesswork or speculation. *See Boswell v. Kearns Garden Chapel Funeral Home*, 227 Iowa 344, 346, 288 N.W. 402, 403 (1939). At the same time, we recognize a probability or likelihood of a causal connection is sufficient to generate a jury question. *Hansen v. Cent. Iowa Hosp. Corp.*, 686 N.W.2d 476, 485 (Iowa 2004).

In order to fully explore the causation issue, we will review the expert testimony to understand the context in which the documentation question arose. We then consider whether Asher offered sufficient evidence on factual causation to allow a jury to find Onuigbo liable on the failure-to-document specification. In the discussion, it will be important to keep in mind the distinction between breach of duty and causation. *See Tyler v. Dworkin*, 747 A.2d 111, 122 (Del. Super. Ct.) (distinguishing in medical records context between breach of duty and causation), *aff'd*, 741 A.2d 1028 (Del. 1999).

One of Asher's experts, Dr. Paul Gatewood, testified that during the first stage of labor (from the beginning of labor to complete dilation of the cervix), the standard of care requires cervical dilation and the station of the fetus in the birth canal be recorded at minimum every two hours. This latter measurement aids the obstetrician in tracking the descent of the fetus through the birth canal. During the second stage of labor (from

complete dilation to birth), Gatewood testified, the station of the baby must be documented hourly. In particular, Gatewood opined Onuigbo's failure to document the station of the fetus during the second stage of labor violated the standard of care. According to Gatewood, documentation allows "an obstetrician to come in hours later, take one look at the curve, and know how the labor has gone." Gatewood testified that if an obstetrician has multiple patients in labor, it may be difficult to recall the progress of each patient's labor without documentation. According to Gatewood,

> If he's got two or three other people in labor, is he gonna necessarily remember what every exam was that he did on each patient that's in labor at the same time? Probably not. So, it's the documentation that allows the physician to refocus every time he comes in to evaluate the patient and make a determination if it's a normal labor.

Gatewood further noted regular documentation of the fetus's descent through the birth canal in the second stage of labor "would increase one's level of awareness and alert the doctor that we may have a problem."

Gatewood further testified Onuigbo breached this standard of care because there was no documentation of the fetus's station between 8:00 p.m. and the time the baby was born, 2:26 a.m. the next day. He further noted the first stage of labor ended, at the latest, by 10:00 p.m. According to Gatewood, this meant there was no documentation of the fetus's station during approximately the final six and one-half hours of the labor, which included at least an approximately four-and-one-half-hour-long second stage.

In addition, Gatewood testified ninety-five percent of women in labor reach the end of the active phase of the first stage of labor[2] within five hours and, because the active phase of her labor began at 9:30 a.m., the active phase of Asher's first stage lasted twelve and one-half hours, which included two protractions, one of which occurred after Asher had been administered Pitocin, a drug that increases the power of contractions.[3] Gatewood described the protraction of the first stage as "significant." He further testified that because the length of the first stage indicated a problem beyond the power of contractions pushing the fetus through the birth canal, there was a further complication slowing the labor.

Gatewood then testified the average length of the second stage of labor for a nullipara, a woman who has never given birth before, who has received an epidural, like Asher, is ninety minutes and that ninety-five percent of nulliparas who receive epidurals deliver within three and one-half hours of complete dilation. He then noted the second phase of Asher's labor lasted nearly four and one-half hours, which indicated a third protraction.

Gatewood testified a protracted labor of this type indicates an increased risk of shoulder dystocia and that an obstetrician faced with the circumstances of Asher's labor should be tuned in to what is causing the protraction and that it might be a problem with the baby fitting

---

[2]Gatewood testified that the first stage of labor is broken into a latent and active stage.

[3]Gatewood testified obstetricians must constantly monitor power, which comes from contractions; the passenger, which is the fetus; and the pelvis, which is the bony structure the fetus must pass through. Asher was administered Pitocin at 4:00 p.m., which according to Gatewood meant she had experienced a protraction disorder prior to that time. Gatewood further testified the fact the first stage did not end until 10:00 p.m. indicated a second protraction during the first stage.

through the pelvis. He further testified that based on all of the facts and circumstances of Asher's labor, her baby should have been delivered via a caesarian section. He testified that while it is possible a permanent brachial plexus injury could have occured with a caesarian section delivery, the risk was significantly reduced.

Asher's other expert, Dr. James Rice, offered substantially similar testimony as to the standard of care in documenting the labor. Like Gatewood, Rice opined Asher violated that standard of care and, based on the facts and circumstances surrounding Asher's labor, her baby should have been delivered via a caesarian section.

Onuigbo also offered expert testimony and testified himself as to the standard of care and the facts and circumstances surrounding Asher's labor. In sum, Onuigbo and his experts downplayed the length of the labor and rate of progress of fetal descent and emphasized fetal monitoring and the need to avoid a caesarian section whenever possible. However, the jury was free to assign no weight to the testimony of Onuigbo and his experts and disregard it entirely. *See, e.g., Top of Iowa Coop. v. Sime Farms, Inc.*, 608 N.W.2d 454, 468 (Iowa 2000) (noting a jury may "discount some testimony and give more credit to other testimony"); *Mensink v. Am. Grain*, 564 N.W.2d 376, 382 (Iowa 1997) (noting a jury is free to disregard expert testimony).

We conclude, based on the record, that Asher presented sufficient evidence to reach a jury on the question of whether the failure to document caused the injury. A reasonable jury could infer from the evidence that Onuigbo was inattentive to the progress of the baby and that his failure to regularly document the progress was a cause of the baby's injuries. As Gatewood testified, the lack of information available to Onuigbo increased the risk of harm to the baby, thereby providing

expert support for causation. In evaluating expert support for causation, we do not require magic words, and the evidence on causation need not be conclusive but must only show reasonable probability. *See Soreide v. Vilas & Co.*, 247 Iowa 1139, 1143, 78 N.W.2d 41, 43–44 (1956); *Ramberg v. Morgan*, 209 Iowa 474, 482, 218 N.W.2d 492, 497 (1928). A reasonable jury could infer from the trial testimony that had Onuigbo ensured that the baby's station was duly recorded hourly in the chart, he would have realized that he faced either an arrest of labor or a severe protraction disorder requiring an exploration of options other than vaginal delivery.

### VI. Conclusion.

For the above reasons, we conclude that although the district court gave an erroneous causation instruction based on the abandoned substantial-factor test instead of on the scope of Onuigbo's liability, the error was not prejudicial and does not require reversal of the jury's verdict. We find substantial evidence supporting a finding that Onuigbo's use of the vacuum extractor was a factual cause of Asher's injuries and conclude Asher engendered a jury question on the causal relationship between Onuigbo's failure to adequately document the progress of the labor and the claimed injury and damages. As a result, the judgment is affirmed.

**AFFIRMED.**

All justices concur except Mansfield and Zager, JJ., who take no part.