# In the Iowa Supreme Court

No. 22–2048

Submitted December 18, 2024—Filed May 30, 2025

**Fatima E. Belhak** and **Abdellatif Elfila,**

Appellees,

vs.

**Denice Smith** and **Women's Care Specialists, P.C.,**

Appellants.

On review from the Iowa Court of Appeals.

Appeal from the Iowa District Court for Scott County, Jeffrey D. Bert, judge.

Plaintiffs seek further review of a court of appeals decision that reversed a jury verdict in their favor in a medical malpractice action. **Decision of Court of Appeals Vacated; District Court Judgment Affirmed.**

McDermott, J., delivered the opinion of the court, in which all participating justices joined. Waterman, J., took no part in the consideration or decision of the case.

Troy L. Booher (argued) and Beth E. Kennedy (until withdrawal) of Zimmerman Booher, Salt Lake City, Utah, and Nancy J. Penner of Shuttleworth & Ingersoll, P.C., Cedar Rapids, for appellants.

Anthony J. Bribriesco (argued) and William J. Bribriesco of Bribriesco Law Firm, PLLC, Bettendorf, for appellees.

**McDermott, Justice.**

When complications arose during the birth of Fatima Belhak's child, the attending physician, Dr. Denice Smith, made an incision to expand the birth canal to complete the child's delivery. Afterward, Smith used sutures to repair the incision. But Belhak soon began experiencing pain and a variety of problems at the wound site, and a few days later, a different physician informed Belhak that what had been diagnosed and treated as a second-degree laceration was a fourth-degree laceration, and that it had become infected. Because of the infection, Belhak had to wait five months to have reconstructive surgery.

Belhak and her husband sued Smith and her employer, Women's Care Specialists, P.C., under several negligence theories. The case went to trial, and the jury ruled in favor of Belhak. On appeal, the court of appeals reversed the judgment, holding that there was insufficient evidence to submit one of the negligence claims to the jury. Belhak sought further review, which we granted.

## I. Factual and Procedural Background.

In 2014, Fatima Belhak and her husband were expecting their first child. When Belhak went into labor, she and her husband went to Trinity Medical Center in Bettendorf, where Belhak had been seeing an obstetrician named Dr. Mona Alqulali. But because Alqulali was unavailable, another obstetrician, Dr. Denice Smith, stepped in.

Complications arose during the delivery. Smith eventually determined that she needed to perform an episiotomy to expand the birth canal. An episiotomy is a procedure in which a small pair of scissors is used to make an incision from the vagina into the perineum, referring to the area between the vagina and anus. Soon after performing the episiotomy, Smith was able to deliver Belhak's baby. After the delivery, Smith concluded that the episiotomy resulted in a

second-degree laceration. She used synthetic surgical sutures with a tensile strength labeled "4-0" to repair the incision.

While she was still in the hospital, Belhak began to have pain in her rectum and noticed stool and blood on her postpartum pad. She reported this to her nurse, who then examined her. Belhak was told that nothing was out of the ordinary, and she was given an ice pack and additional medicine for the pain. Belhak went home after two days in the hospital.

Shortly after her discharge, Belhak observed stool coming out of her vagina. She and her husband called the hospital to report the issue. Smith told her to come to the clinic the next day, but Belhak instead went to the emergency room at a different hospital. The emergency room doctors sent her to the University of Iowa Hospitals and Clinics in Iowa City. The University's doctors diagnosed Belhak with a fourth-degree laceration and a rectovaginal fistula—a hole between the rectum and vagina that allowed for stool and gas to pass through her vagina. Belhak had also developed an infection, which is a common symptom when a rectovaginal fistula is not promptly treated. Because she had an infection, Belhak needed to wait for it to clear before undergoing reconstructive surgery to repair the fistula.

The infection took five months to clear. In those five months, Belhak had to take thirty-minute sitz baths every time she used the bathroom to disinfect the wound. The physical pain made it more difficult to walk, care for her newborn child, lift heavy objects, and sit or sleep in certain positions. Smith's social life diminished as she couldn't control her bowels because of the fistula. She also began to restrict her diet to avoid diarrhea, which she couldn't easily control.

Some of Belhak's symptoms did not improve immediately after the surgery. At times, she had embarrassing uncontrolled gas, making her not want to leave

the house. She began physical therapy, but her pelvic pain wouldn't go away. Belhak's fear of reopening the wound changed her sexual relationship with her husband. Her doctors tried a variety of medications but eventually turned to nerve blockers that needed to be injected into her vagina.

Belhak and her husband ultimately sued Smith and her employer for negligence and loss of consortium. The parties presented evidence and argument in a seven-day jury trial. Their respective theories of the case were relatively straightforward. Belhak asserted that her injuries were caused when Smith either (1) failed to perform a rectal examination after the episiotomy, (2) failed to diagnose her with a fourth-degree laceration, or (3) used too small a suture on the laceration. Smith's theory was that the episiotomy itself resulted in only a second-degree laceration but that the laceration expanded after Belhak left the hospital from some strain on her rectum. Before trial, Smith suggested that the strain on Belhak's rectum could have resulted from either a difficult bowel movement or anal intercourse, but the district court granted a pretrial motion in limine preventing evidence or argument about the anal intercourse theory.

At the end of Belhak's case, Smith moved for a directed verdict, arguing that Belhak's medical expert, Dr. Gregory Chen, failed to establish a causal link between Smith's conduct and Belhak's harm. The court denied the motion. Because the witnesses were called out of order, Smith had already presented all her evidence before making this motion, so both parties rested.

After Belhak's closing argument, Smith moved for a mistrial. Smith argued that a mistrial was required because during closing argument Belhak's lawyer (1) accused Smith's lawyer of "character assassination," (2) vouched for his clients by telling the jury they had to hold Smith accountable, (3) made a "golden rule argument," and (4) misstated the record. The district court took the motion

under advisement but gave the jury a limiting instruction as to the mention of anal intercourse during Belhak's closing. The jury entered a verdict finding Smith liable and awarded Belhak $3.25 million in damages.

Smith moved for a new trial under Iowa Rule of Civil Procedure 1.1004 (2022). She argued that the district court erred in not granting her earlier motion for directed verdict and that she was entitled to a new trial based on (1) improper conduct by Belhak's lawyer during closing argument, (2) improper questioning of witnesses during trial, (3) improper communication by Smith's own expert witness, Dr. Larry Severidt, with a juror during a recess, and (4) insufficient evidence to submit to the jury the specifications of negligence on both the rectal examination and the use of 4-0 sutures. The district court denied the motion for new trial.

Smith appealed, and we transferred the case to the court of appeals. The court of appeals reversed, concluding that the district court erred in submitting the 4-0 suture specification of negligence to the jury. Belhak applied for further review, which we granted.

**II. Analysis.**

Smith's arguments on appeal fall into two broad categories: (1) that the district court erred in failing to grant a new trial based on misconduct by Belhak's lawyer during the trial, and (2) that the district court erred in denying her motion for directed verdict concerning the use of 4-0 sutures.

**A. Trial Misconduct Arguments.** Smith argues that Belhak's lawyer engaged in misconduct both during his examination of witnesses and in his closing argument, and that the misconduct, both individually and cumulatively, warrants a new trial. Denial of a motion for mistrial is reviewed for an abuse of discretion. *Kinseth v. Weil-McLain*, 913 N.W.2d 55, 66 (Iowa 2018). We have said

before that both alleged instances of misconduct that Smith raises are reviewed for abuse-of-discretion. *See, e.g., Giltner v. Stark*, 219 N.W.2d 700, 706 (Iowa 1974) (examination of witnesses); *Olson v. BNSF Ry.*, 999 N.W.2d 289, 300 (Iowa 2023) (closing argument misconduct).

Under an abuse-of-discretion standard, "the district court may choose one among many acceptable alternatives, so long as its choices are not clearly untenable or unreasonable." *State v. Tucker*, 982 N.W.2d 645, 657 (Iowa 2022). In applying this standard, "we give a great deal of leeway to the trial judge who must make [a] judgment call." *State v. Newell*, 710 N.W.2d 6, 20–21 (Iowa 2006). The notion of abused *discretion* "only makes sense . . . if it is assumed that an official or judge has considerable decisional freedom, or leeway, short of abuse." Frederick Schauer, *Thinking Like a Lawyer* 191 n.6 (2009).

1. *Objections to questions.* On the improper questioning claim, Smith argues that she was prejudiced by having to make fifty-six sustained objections to improper questioning during the seven-day trial. Belhak argues that Smith's objections were mostly to the form of the question and not to its substance, and she suggests that the objections were part of a strategy to develop grounds for mistrial. The district court rejected Smith's argument that the number of sustained objections to questions warranted a mistrial.

Smith points to our holding in *Brooks v. Gilbert*, 98 N.W.2d 309 (Iowa 1959), in support of her argument. In *Brooks*, the family of a six-year-old girl who had been struck by a car in a hit-and-run sued the suspected driver. *Id.* at 310. The plaintiff's lawyer attempted to use photos of the street to establish where on the street the car had struck the girl. *Id.* at 311. But instead of calling actual eyewitnesses, the family's lawyer called the police officer who had interviewed the eyewitnesses. *Id.* After showing the officer one of the photos, the

family's lawyer would ask, "Where did you establish that point of impact?" *Id.* The question drew a sustained hearsay objection from the defendant. *Id.* Apparently undeterred, the family's lawyer asked the same question, or a variation of it, thirteen times. *Id.* at 311–12. The district court sustained every hearsay objection to the question. *Id.* On appeal, we held that the lawyer's repeated question to the officer prejudiced the defendant, reasoning that "although objections were sustained, [the result] was to indelibly fix in the minds of the jurors . . . the point of impact." *Id.* at 312.

But the questions in this case are of a different character. Based on our review, the objections generally addressed problems with the form of the question—usually a leading question during a direct examination. "This court has often stated that trial court has considerable discretion in admit[t]ing or excluding answers to leading questions and there must be a clear abuse of discretion to justify a reversal." *Giltner*, 219 N.W.2d at 706. Unlike in *Brooks*, the objectional questions here did not improperly convey or suggest information about the key factual issue at trial. By our count, of the seventy-seven total objections lodged by Smith's attorney, only a few related to the substance of a question. We thus find no abuse of the district court's discretion in its ruling on this point.

2. *Closing argument.* In her argument about misconduct during closing argument, Smith argues that Belhak's counsel (1) improperly appealed to the jurors' emotions and (2) misled the jury by misstating the record. We review whether the district court erred in refusing to grant a new trial based on misconduct during closing argument under an abuse-of-discretion standard.

a. *"Betrayal" and "accountability."* Smith first argues that Belhak's lawyer improperly appealed to jurors' emotions by characterizing Smith's actions as

"betrayal" during closing argument and developing a theme of "accountability" during closing. The word "betrayal" appeared when Belhak's lawyer described how Belhak asked her husband "to buy a mirror, so she could see with her own eyes, stool coming out, and when she did, she felt betrayed by her doctor who spoke the same language and who saw her every prenatal visit." Smith argues that the word improperly focused the jury's attention on the moral quality of Smith's conduct and not on whether Smith acted negligently. Misconduct may arise when a lawyer during closing argument employs "overinflammatory means that go outside the record or threaten to improperly incite the passions of the jury." *State v. Carey*, 709 N.W.2d 547, 556 (Iowa 2006).

In making a motion for mistrial before presenting her own closing argument, Smith never offered the reference to "betrayal" as a basis for the motion. The argument first appears in Smith's posttrial motion. But in ruling on the posttrial motion, the district court broadly addressed whether counsel's statements during closing argument sufficiently prejudiced Smith to warrant a new trial without mentioning Smith's "betrayal" argument. Smith never filed a motion to enlarge the ruling under Iowa Rule of Civil Procedure 1.904 asking the district court to address this statement. In any event, "[t]o warrant a new trial based on attorney misconduct, the complained of misconduct 'must have been prejudicial to the interest of the complaining party.' " *Kinseth*, 913 N.W.2d at 68 (quoting *Mays v. C. Mac Chambers Co.*, 490 N.W.2d 800, 803 (Iowa 1992)). "[U]nless a different result would have been probable in the absence of misconduct, a new trial is not warranted." *Loehr v. Mettille*, 806 N.W.2d 270, 277 (Iowa 2011). We have noted that trial courts—"[a]s firsthand observers of the alleged misconduct"—are in the best position to determine whether the alleged misconduct was prejudicial. *Olson*, 999 N.W.2d at 300. Based on this record, we

find no abuse of discretion in the district court's refusal to grant a new trial on this point.

b. *"Golden rule."* Smith next argues that Belhak's counsel improperly advanced a so-called "golden rule" argument when asking the jury to assess damages. A "golden rule" argument is one that asks the jurors to put themselves in the victim's position, *State v. Musser*, 721 N.W.2d 734, 754 (Iowa 2006), and "encourages the jury to depart from neutrality and to decide the case on the basis of personal interest and bias rather than on the evidence," *Ivy v. Sec. Barge Lines, Inc.*, 585 F.2d 732, 741 (5th Cir. 1978).

During the challenged portion of the argument, Belhak's lawyer began by telling the jury that he was "going to give you guys some tools" and then asked them to "imagine" a story. He then described a hypothetical conversation between a "man in a suit" with a briefcase and "Latif [the husband] and Fatima" about whether, before the baby's birth, they would have traded the problems resulting from Smith's negligence for seven million dollars:

> The man sits down. On the kitchen table, he puts a big briefcase, and he opens it up: seven million dollars. . . . And [the man] says,

> "Latif, Fatima, this money, it's yours, but there's a catch. Tomorrow [the baby] is going to be fine, but Fatima, you are not going to be. You are going to have a cut and ripping and tearing in one of the most sensitive areas of your body, and that's going to cause you pain. It's going to cause you discomfort for the rest of your life." . . . "When you are in the hospital, you are going to have stool pass through your vagina. And when you come home from the hospital, for months, you are going to have the same thing. You're going to spend 20 to 40 minutes in the bathroom, instead of being able to spend time with your baby, your mom and your husband. You are going to get reconstructive surgery, but because of the muscles atrophying and hardening, when they put it back together, it's going to be different; not as flexible, and there's going to be scar tissue, and that scar tissue and that inflexibility, every time you move, you are going to be reminded of it. . . . Your husband, now, of course, he is going to love you no matter what, but sexual

intercourse -- intercourse, it's going to be painful. It's going to be different." . . . "Because of the scar tissue and where the tear is, you are going to have uncontrollable gas. If you are out in public, maybe you can try and distract by (indicating), hitting your foot on the ground, but -- and diarrhea and stool, you are going to have very little warning."

So before the man in the suit and his briefcase goes on and on and on, Latif and Fatima, what will they tell him? They would tell him, "No. Fatima's health and family is the most important thing there is," and they would tell him to get out of their house.

We have generally found golden-rule arguments when lawyers have directly asked jurors to think of themselves in the victim's position. *See, e.g., State v. Brown*, 856 N.W.2d 685, 688 (Iowa 2014) ("If you can't look at it through the eyes of [the victim], I would ask you to look at it through the eyes of when you were 7. Go back to when you were 7 years-old and something like this happened to you . . . ." (omission in original)); *Russell v. Chi., Rock Island & Pac. R.R.*, 86 N.W.2d 843, 848 (Iowa 1957) ("[H]ow much money would you jurors take to go through life injured as this man is[?]"). The district court, having heard the story during closing argument, concluded that it did not constitute a golden-rule argument because it did not suggest that the jurors put *themselves* in the plaintiffs' shoes but instead introduced the concept of damages by summarizing the pain and suffering that Belhak had testified she endured.

We are less certain on this point, but in any event, we do not believe that the story was sufficiently prejudicial to warrant a new trial. We note the damages that the jury awarded were far less than those mentioned in the story. Reading the closing arguments as a whole, we are not convinced this device was so compelling as to have caused the jurors to decide the case based on their emotions rather than the evidence.

As a result, we find no abuse of discretion in the district court's denial of the motion for new trial on this issue.

c. *Hippocratic oath.* Smith also argues that Belhak's attorney misstated the record to disparage Smith's expert witness, Severidt, during closing argument. Belhak's lawyer cited the testimony of Belhak's expert, Chen, to argue prophylactic episiotomies are an outdated practice. Drawing on this, Belhak's lawyer argued:

> What did Dr. Severidt also tell you? That in 2000 -- that in the United States, you don't do that. You don't automatically do an episiotomy because it could bring harm to a woman. So what is the difference between the mothers in the United States and the mothers in Honduras? Well, Dr. Severidt allows his students to go down there to Honduras and do something he knows is wrong in the United States, and you are allowed to question anything else he says.

Belhak's lawyer later added:

> Even though he swore the Hippocratic oath, to do no harm, and he knows not to do episiotomies prophylactically in the United States, he changes his standard of care, and when it's right and wrong, when he goes to Honduras.

The district court found that these comments were improper, observing that although a lawyer may question an opposing expert's credibility, Belhak's lawyer went too far by suggesting that Severidt violated the Hippocratic oath and performed inappropriate procedures. But the district court went on to explain that counsel did not belabor the point and that the jury heard the trial testimony from all the medical experts who said that episiotomies remain appropriate procedures in the United States. The district court further suggested that the jurors understood the focus of the trial was the diagnosis and repair of Belhak's incision, not the propriety of episiotomies in general. The district court ultimately concluded that the improper statements involving Severidt did not cause the jury to reach a different verdict than it otherwise would have.

Although the comments were improper, we find no abuse of discretion in the district court's ruling that the statements did not warrant a new trial. *See Olson*, 999 N.W.2d at 299.

d. *"Character assassination."* Smith also argues that Belhak's lawyer improperly accused Smith's counsel of "character assassination" during closing argument. This issue began when, before trial, Belhak filed a motion in limine seeking to prohibit Smith from introducing any testimony or statements that Belhak had anal intercourse with her husband before or after the delivery. The district court granted the motion in limine. But during the trial, Smith's lawyer asked Chen—the first witness in the case—about whether anal intercourse could disrupt the repair of an episiotomy. Chen answered, "Not necessarily." Smith's lawyer then asked, "Well, anal intercourse is awful close to the perineum and vaginal repair; is that right?" Belhak's lawyer objected, and the district court sustained the objection and admonished the jury to disregard the questions.

After Chen's testimony, Belhak's lawyer alerted the district court and Smith's lawyer that he intended to ask Belhak about anal intercourse since—the jury having now heard about it from defense counsel's question—in his view, "[Y]ou can't unring the bell." The district court noted that the jury had already been admonished to disregard the question but conceded that "[i]t's your trial strategy." During Belhak's testimony, Belhak's lawyer asked her whether she had ever had anal intercourse (to which she answered no) and whether it was contrary to her religious faith (to which she answered yes).

During closing argument, Belhak's lawyer returned to the subject, stating:

> [A]nd you can talk about the two competing stories; that there was a fourth-degree extension at the time of delivery, which all the doctors know is a known risk, or somehow Fatima had a monster bowel movement once she left the hospital, and it tore her rectum. When you think about it, that's kind of funny. Do you know what is

not funny? When [Smith's lawyer] accused Latif and Fatima of having anal sex within days of delivering their baby with no proof. That's not funny. That's character assassination, running Latif and Fatima's name through the mud on such an outrageous accusation without any proof.

After Belhak's lawyer completed his closing argument, Smith moved for a mistrial based in part on the "character assassination" statement. The district court took the motion under advisement. But before Smith's lawyer began his closing argument, the district court informed the jury that Belhak's lawyer's statement about defense counsel was improper and admonished the jurors to disregard it.

Belhak's lawyer argued that he needed to address the anal intercourse issue after Smith's lawyer raised the issue in front of the jury. Belhak argued that the anal intercourse question not only violated the ruling in limine but was also inflammatory and designed to impugn Belhak's character. Smith, in response, noted that defense counsel asked only Chen, and not Belhak, about anal intercourse and argued it was a proper medical question that did not implicate Belhak's character but instead went to the key issue in the case.

The district court agreed with Smith that Belhak's lawyer's statement was improper. After noting that curative instructions are generally considered sufficient in most cases to allow a jury to reach a verdict without improper influence, the district court concluded that the curative instructions given during Chen's testimony and closing argument sufficiently resolved the risk of the jury's improper consideration surrounding it.

We agree that Belhak's lawyer's "character assassination" statement was improper. But this improper statement was quickly followed by the district court's admonition to the jury. *State v. Christensen*, 929 N.W.2d 646, 660 (Iowa 2019) ("[W]e have stated curative instructions are generally sufficient to

cure most trial errors."). We agree with the district court that this statement does not meet the threshold for granting a new trial. We thus find no abuse of discretion in the district court's ruling.

e. *The University's medical records.* Smith argues that Belhak's lawyer misled the jurors by telling them that the University of Iowa's medical records resolved the disputed issue of the timing of Belhak's injury. The findings from a University treatment record stated:

> 1 cm tissue bridge separating the vaginal and rectum with loose approximating sutures. After removal of suture material, a complete fourth-degree perineal laceration was identified extending 2 cm proximal from the posterior fourchette.

Smith complains that Belhak's lawyer twice stated during closing argument that in this medical record, the University of Iowa "said" that the fourth-degree laceration happened "at the time of delivery." Smith argues that because the University's doctors didn't see Belhak until several days after she'd been discharged following the child's birth, the University's doctors could not purport to identify the timing of her injury. No University doctor testified at trial to explain the meaning of this statement in the medical record.

Belhak argues that there was nothing improper about counsel's interpretation of the medical record because counsel "is allowed to draw conclusions and argue permissible inferences that may be reasonably derived from the evidence." *State v. Shanahan*, 712 N.W.2d 121, 139 (Iowa 2006). Belhak also asserts that because the medical records were admitted into evidence, any prejudice from his argument would be minimal at best because the jury could see for itself what the records said.

The district court concluded that it was improper for Belhak's lawyer to characterize the University as "saying" that the fourth-degree laceration

happened at the time of delivery. But the district court also concluded that the statement did not prejudice Smith. The district court noted that the jury was advised that arguments are not evidence. The jury was aware that no witness from the University came to testify to confirm Belhak's lawyer's interpretation.

The district court highlighted that the jury had the record to determine for itself whether Belhak's interpretation aligned with what her lawyer said. A reasonable juror, in the district court's view, could recognize that the treatment record was prepared contemporaneously with the treatment and thus days after Belhak had been discharged after the delivery. Both parties had the opportunity to present their own arguments about the proper reading of the medical records in the case. The district court thus concluded that no prejudice resulted from these statements. We find no abuse of discretion in the district court's reasoning or conclusions on this point.

f. *Cumulative effect.* Smith argues that even if the points of error that she raises do not individually result in prejudice, the cumulative effect of Belhak's lawyer's misconduct during closing argument pushes it over the prejudice threshold. We have said that although a single improper statement might not amount to prejudice, the cumulative effect of several could. *Andrews v. Struble*, 178 N.W.2d 391, 402 (Iowa 1970).

In *Kinseth v. Weil-McLain*, we reversed a jury's verdict based on a lawyer's misconduct during closing argument after the lawyer made a series of improper arguments spanning a wide array of subjects, including comparing the plaintiff's request for compensatory damages to a percentage of the amount that the defendant's expert billed for his services, asking the jury to consider the amount of money that the defendant had spent defending the lawsuit, asking the jury to "send a message" by using compensatory damages to punish the defendant, and

asking the jury to consider other instances where the defendant had been sued for similar conduct. 913 N.W.2d at 70–72.

The conduct in this case, whether viewed individually or cumulatively, is far less egregious than what we confronted in *Kinseth*, which involved many appeals for the jury to decide the case based on considerations untethered to the evidence. We highlighted in *Kinseth*, among other statements, the lawyer's assertion "that a punitive damages award between $4 million and $20 million 'is certainly within the realms of what [the defendant] ha[s] paid in this litigation.' " *Id.* at 70 (second alteration in original). We concluded that the only purpose of these types of "jarring" appeals to emotion "is to alert the jury that [the defendant] has deep pockets and can afford a substantial award." *Id.*

In this case, the district court—having considered "the severity and pervasiveness of the misconduct, the strength of the evidence, the significance of the misconduct to the central issues, the use of curative instructions[,] and the extent to which the defense invited the misconduct"—determined that the cumulative effect did not warrant a new trial. The district court concluded that none of the alleged misconduct impeded the jury's ability to make a fair determination based on the evidence about the central question in the case: whether Belhak sustained a fourth-degree laceration during the birthing process, and not at some later point, such that Smith necessarily failed to properly diagnose and suture the injury after the birth. On this point, once again, we review for an abuse of discretion. *See State v. Burkett*, 357 N.W.2d 632, 638 (Iowa 1984). We agree with the district court that any prejudice to the defendants from these objectionable statements cumulatively falls below the threshold for granting a new trial. *See Mays*, 490 N.W.2d at 803.

**B. Motion for Directed Verdict Concerning the Use of 4-0 Sutures.**

Smith moved for a directed verdict during trial, and later filed a motion for a new trial, arguing that there was insufficient evidence to submit to the jury that Smith was negligent by using 4-0 sutures to repair the episiotomy. "Our review of a district court's ruling on a motion for new trial depends on the grounds raised in the motion." *Bryant v. Parr*, 872 N.W.2d 366, 375 (Iowa 2015). The grounds that Smith identifies on appeal center on evidentiary rulings, and evidentiary rulings are generally reviewed under an abuse-of-discretion standard. *State v. Tipton*, 897 N.W.2d 653, 690 (Iowa 2017).

The jury returned a general verdict, meaning that it found in favor of the plaintiffs without resolving specific fact questions about the basis for its verdict. As a result, the jury's verdict could have been grounded on one of several acts of negligence. "A new trial is required," we have said, "if the evidence was insufficient to submit one of several specifications of negligence." *Alcala v. Marriott Int'l, Inc.*, 880 N.W.2d 699, 710 (Iowa 2016). Smith thus would be entitled to a new trial if any of the three negligence allegations lacked sufficient evidence to go to the jury. Smith thus would be entitled to a new trial if there was insufficient evidence to submit to the jury on any one of the three negligence specifications. Here, Smith argues there was insufficiency only as to the third specification: that Belhak failed to offer evidence that Smith's use of the 4-0 sutures caused the harm.

"Where a defendant's challenge is to the sufficiency of the evidence, we will affirm the trial court's denial of the defendant's motion for directed verdict if the plaintiff's claims are supported by substantial evidence." *Boham v. City of Sioux City*, 567 N.W.2d 431, 435 (Iowa 1997). "Evidence is substantial when reasonable minds would accept the evidence as adequate to reach the same

findings." *Doe v. Cent. Iowa Health Sys.*, 766 N.W.2d 787, 790 (Iowa 2009). This doesn't mean the evidence must be "conclusive" but rather simply "more probable than any other hypothesis based on such evidence." *Id.* at 793 (quoting *Ramberg v. Morgan,* 218 N.W. 492, 497 (Iowa 1928)).

A medical negligence claim requires a plaintiff to prove the applicable standard of care, a violation of that standard, a causal connection between the defendant's violation and the plaintiff's injury, and damages. *See Susie v. Fam. Health Care of Siouxland, P.L.C.*, 942 N.W.2d 333, 337 (Iowa 2020). As to causation specifically, the plaintiff must show that the defendant's conduct "more likely than not" caused the plaintiff's harm. *Id.* Iowa law requires an expert witness to establish causation if it "is not within the knowledge and experience of an ordinary layperson." *Doe,* 766 N.W.2d at 793. It's undisputed that an expert was required to prove the medical negligence alleged in this case.

Several witnesses at trial testified about the different types of sutures used to repair lacerations. Chen explained the different calibers of sutures, ranging from the largest and strongest—numerically referred to as "0-0"—to the smallest and weakest—numerically referred to as "4-0."

Smith admitted that although she had only received training on the 4-0 sutures and that she wouldn't have been able to repair a wound that required a stronger suture, Belhak's wound did not require a stronger suture. The experts clashed on this point: Chen testified that the standard of care for an episiotomy requires sutures with a tensile strength of 2-0 or 3-0, while Severidt testified that Smith's use of the 4-0 sutures in this case complied with the standard of care.

Smith argues that Belhak's negligence claim involving the 4-0 sutures relies on Chen's interpretation of the University's medical record and the record's statement that the "vaginal repair site appears broken down." Smith argues that

Chen admitted that he could not tell whether this meant that the sutures had broken or whether the laceration had expanded beyond what Smith had sutured. According to Smith, this means that Belhak presented no evidence that the 4-0 sutures failed or that such a failure caused Belhak's injury. As a result, Smith argues, the district court erred in denying her motion for directed verdict and her posttrial motion for new trial.

Expert testimony that is merely speculative is insufficient to establish causation. In *Susie v. Family Health Care of Siouxland, P.L.C.*, a plaintiff alleged medical negligence based on the defendant's delay in administering an antibiotic and asserted that this delay ultimately caused the defendant to have his arm amputated. 942 N.W.2d at 337. In our review of the testimony on causation, we concluded that the plaintiff's expert "provide[d] no guidance for the jury on how or if [the plaintiff's] outcome would have been different if antibiotics were administered one day earlier." *Id.* at 338. We stated that "[w]hile an expert is not required to express an opinion with absolute certainty," the plaintiff's expert "provide[d] only speculative and confusing testimony on causation." *Id.* at 338–39. Because the plaintiff lacked evidence to create a jury question on causation, we vacated the court of appeals decision and affirmed the district court's granting of the defendant's motion for summary judgment.

In *Asher v. OB-GYN Specialists, P.C.*, the parents of a child born with a brachial plexus injury and a broken clavicle sued an obstetrician and his practice for the injuries the child suffered during childbirth. 846 N.W.2d 492, 495 (Iowa 2014), *overruled on other grounds in Alcala*, 880 N.W.2d 699. The plaintiffs alleged in part that the doctor failed to maintain an adequate chart tracking the mother's labor and that this chart would have alerted the doctors that she was in protracted labor. *Id.* at 501–02.

The plaintiffs' experts in *Asher* never directly testified that the inadequate chart was the cause of the harm. *Id.* The experts' testimony instead (1) established the standard of care, (2) explained that a chart that fails to track the patient's labor every hour falls below that standard of care because it fails to alert the doctor to possible labor complications, (3) stated that one of those complications is protracted labor, (4) asserted that the plaintiff's chart didn't track the labor every hour, (5) explained that the plaintiff was in protracted labor, and (6) opined that protracted labor creates "an increased risk" for the same type of injury that the child suffered. *Id.* Although not having made a direct statement about causation, but having testified to each of these components, we held that a reasonable jury could infer that the doctor's failure to keep an adequate chart caused the alleged injuries. *Id.* at 503.

The district court found Chen's testimony sufficient to create a jury question on causation concerning whether Belhak's injuries resulted from Smith's use of incorrect sutures. Whether expert testimony creates a sufficient probability or likelihood of a causal connection to generate a jury question requires us to review the testimony in the case. *Id.* at 501.

Chen testified about the tensile strength of the sutures to enable the jury to understand the consequences of using too weak of a suture.

> A. . . . For an episiotomy, if you want to use appropriate tensile strength, it would be 2-0 or 3-0 vicryl, an appropriate choice. It's an absorbable suture. Polyglactin suture is the chemical name. It's an appropriate choice, but 4-0 is too fine of a suture, in my opinion. It would increase the risk of the wound breaking down or not have enough strength to hold it together.
>
> Q. When you say, "the wound breaking down," could you describe that more?
>
> A. The wound breaking down or opening up or that stitch opening up. If you get stitches on your arm from a cut, and you are goofing around, and someone hits you, it opens up, because it

breaks apart the sutures, because of not enough strength holding it together. So we are able to -- With a 4-0, it is a finer suture. It would not be strong enough to hold that tissue together. . . . The other issue I have, in particular with using 4-0 vicryl, it comes on a smaller needle, and in general, when you're doing episiotomy repair, if you can remember how far apart the tissue is in that picture you need to get what we call a wider bite -- I apologize -- is what we call in medicine a larger bite of issue with a pretty large needle to get a big area of tissue to bring it back together[.] [A]nd the 4-0 -- I have the sutures here to make it easier for the jury to see -- is a finer needle. You use it on small vaginal lacerations around the urethra. Those, in general, they bleed a lot but are very superficial, so you want a fine, smaller needle to sew those up. In general, that's what we are using 4-0 vicryl for. It should not be used on the perineum – deep perineal tissues. It certainly should not be used as part of the episiotomy repair.

After this testimony, Chen testified about the University of Iowa medical records stating that when Belhak arrived, she had a fourth-degree laceration and that at least part of the wound did not have any sutures:

Q. "Per Dr. Miller vaginal repair site appears broken down and she does note stool in the vagina." Did I read that correctly?

A. Yes.

Q. And so, what does the fact that Fatima Belhak's vagina repair site appears broken down, what does that mean?

A. It's hard to say, exactly. From what my guess is, they are seeing an opening either in the perineum or in the vagina or both.

Q. And when you say an "opening," was your understanding that Dr. Smith attempted to repair -- to repair the episiotomy?

A. Yes.

Q. And so, when you say -- Could you describe what are -- When you are looking at this record, what does it mean to you?

A. So broken down means they may see some intact stitches, but you will see tissue that is not sutured, but appears to be separated.

After this discussion, Belhak's counsel asked several questions more directly addressing the causal connection between the 4-0 sutures and Belhak's injury:

> Q. Within a reasonable degree of medical certainty, that being more likely true than not, was Dr. Smith's breach of the 4-0 sutures that she used a cause of the vaginal repair site breaking down?

> A. My interpretation, also, they may think it was broken down, meaning they assume, for example, a fourth degree was repaired, and they see a defect in the perineum and don't see sutures there, so they are assuming some of the sutures were dissolved versus it not being repaired at all.

> Q. Sure. So you can't tell whether -- which circumstance, but you know that whatever sutures that this medical provider is looking at has been broken down?

> A. Some of the suture, yes.

The court of appeals concluded that Chen's testimony, particularly in his answers to the final two questions, were cryptic or confusing and thus did not establish a causal link sufficient to create a jury question. But in our view, when reading Chen's testimony in its entirety, his testimony permits a reasonable jury to conclude that, in Chen's opinion, Smith's use of the weaker 4-0 sutures caused the breakdown at the wound site. *See Asher*, 846 N.W.2d at 500.

Chen's testimony is thus more akin to the expert testimony in *Asher* than in *Susie*. Chen discussed at length that the standard of care required a 2-0 or 3-0 suture for an episiotomy. He explained how and why a 4-0 suture fell below that standard of care. He described in general terms that if a 4-0 suture was used, "[i]t would increase the risk of the wound breaking down or not have enough strength to hold it together." The "increased risk" language was the same language used in *Asher*. *See* 846 N.W.2d at 500. He then explained that the medical records showed that when she arrived at the University's hospital, her wound had "some intact stitches" but there was "tissue that [was] not sutured,"

and "appear[ed] to be separated." He testified to his conclusion from this medical record that at least some of the sutures had broken down.

To determine whether Belhak generated a fact question for the jury, we "review the evidence presented in the light most favorable to the nonmoving party." *Dettmann v. Kruckenberg,* 613 N.W.2d 238, 250–51 (Iowa 2000) (en banc). Considering the full scope of Chen's testimony, we find no error in the district court's conclusion that the jury could rely on evidence, and not speculation, to find that the 4-0 sutures caused the breakdown at the wound site.

The court of appeals also held that even if Chen's testimony established that the 4-0 sutures caused a breakdown, Belhak failed to elicit testimony that the deficient sutures caused the multi-month delay in properly repairing the episiotomy and thus the harms resulting from that delay. Chen's testimony established that the improper sutures also necessitated the delay in her surgery to repair the open wound. Chen testified that the improper sutures brought on Belhak's infection in the wound area because they left the wound area open. Chen stated that a possible rectovaginal fistula is "an urgent matter that needs to be investigated . . . to rule out infection and other potential complications." But the infection, once present, forced Belhak to wait to have surgery because "repair[ing] it at this time will have a low success rate" and might require avoidable repeated surgeries. And he said that the need to wait to have surgery caused Belhak both short and long-term harm.

In short, Chen's testimony permits the jury to draw a reasonable inference that the use of the 4-0 sutures caused the breakdown at the wound site that led to the infection, and that the infection necessitated the delay in the surgical repair. Because sufficient evidence supported this specification of negligence, we

affirm the district court's denial of the motions for directed verdict and for new trial.

**III. Conclusion.**

We vacate the court of appeals decision and affirm the district court's judgment in favor of the plaintiffs.

**Decision of Court of Appeals Vacated; District Court Judgment Affirmed.**

All justices concur except Waterman, J., who takes no part.